Argued and submitted September 16, judgment of Tax Court affirmed
December 12, 2013

TEKTRONIX, INC. & SUBSIDIARIES,
*Plaintiff-Respondent,*

*v.*

DEPARTMENT OF REVENUE,
*Defendant-Appellant.*

(TC 4951; SC S060912)

316 P3d 276

Marilyn J. Harbur, Senior Assistant Attorney General,
Salem, argued the cause and filed the brief for defendant-
appellant. With her on the brief were Ellen F. Rosenblum,
Attorney General, and Douglas M. Adair, Senior Assistant
Attorney General.

Robert T. Manicke, Stoel Rives LLP, Portland, argued the cause and filed the brief for plaintiff-respondent. With him on the brief were Eric J. Kodesch and Brad S. Daniels.

WALTERS, J.

## WALTERS, J.

This case is before us on direct appeal from a general judgment of the Tax Court. *See* ORS 305.445 (authorizing such appeals). In 2006, the Department of Revenue (department) issued a notice of deficiency against Tektronix, Inc. (taxpayer) for $3.7 million in additional tax for taxpayer's 1999 tax year. Taxpayer contended that (1) the statute of limitations barred the department from assessing that deficiency, and (2) in any event, the department had incorrectly calculated its tax liability. The Tax Court granted partial summary judgment for taxpayer on both grounds. *Tektronix, Inc. v. Dept. of Rev.*, 20 OTR 468 (2012). The department appeals. For the reasons that follow, we agree with taxpayer that the department incorrectly calculated taxpayer's tax liability, and we affirm the Tax Court.

On appeal from a grant of summary judgment, we consider whether the Tax Court erred in concluding that there was no genuine issue of material fact and that taxpayer was entitled to summary judgment as a matter of law. *See* TCR 47 C (standard for granting summary judgment); *Martin v. City of Tigard*, 335 Or 444, 449, 72 P3d 619 (2003) (applying that standard on appeal from Tax Court decision). In this case, the relevant facts do not appear to be disputed.

Taxpayer is in the business of developing and selling test, measurement, and monitoring equipment. During its 1999 tax year, taxpayer sold its printer division to another corporation for approximately $925 million. Of that sale price, roughly $590 million represented the gross proceeds for intangible assets, which taxpayer refers to generally as "goodwill."[1] When taxpayer filed its original tax return for its 1999 tax year, it did not include the $590 million in the "sales factor," a figure used to apportion business income between states and that, if included, would have increased taxpayer's Oregon tax liability. (We will discuss the sales

---

[1] One issue presented by the department on appeal relies on the assertion that the label "goodwill" is a mischaracterization; the $590 million actually derived from seven different types of intangible assets, only one of which was in fact goodwill. Nothing in our opinion depends on the extent to which the $590 million was derived from goodwill *per se*. The department's concession that the source of the $590 million was intangible assets is sufficient.

factor in detail later.) Taxpayer claimed and received an Oregon tax refund for that year.

Ordinarily, the department has three years from the date that a tax return is filed to give notice of a deficiency. ORS 314.410(1) (2005).[2] In this instance, the department did not give notice of deficiency within three years of the date that taxpayer filed its 1999 tax return.

For the tax year 2002, taxpayer filed state and federal tax returns that reported a net capital loss. Under federal and state law, that net capital loss allowed taxpayer to take what is known as a "net capital loss carryback," in which a taxpayer applies some of its net capital loss from one year to its tax obligations from previous years. *See West's Tax Law Dictionary* 148 (2013) ("carryback" refers to "[t]he application of a deduction or credit from a current tax year to a prior tax year"); *Black's Law Dictionary* 242 (9th ed 2009) ("carryback" means "[a]n income tax deduction (esp. for a net operating loss) that cannot be taken entirely in a given period but may be taken in an earlier period (usu. the previous three years)"). Taxpayer sought to apply its 2002 net capital loss to its federal tax obligation for 1999, filing a form with the federal Internal Revenue Service (IRS). The form asked for a tentative refund of taxpayer's 1999 federal taxes, which the IRS paid.

In 2005, however, the IRS audited taxpayer's returns for tax years 2000-02 and issued a Revenue Agent's Report that adjusted taxpayer's tax liability. The report concluded that taxpayer had claimed too much net capital loss for 2002, and it reduced that amount. Because taxpayer was not entitled to as much net capital loss for 2002 as it had claimed, taxpayer also was not entitled to carry back to 1999 as much of that loss as it had done when it filed the form with the IRS. The report that the IRS issued in 2005 reduced the net capital loss carryback that taxpayer could claim in 1999

---

[2] The legislature amended ORS 314.410 in 2007. Or Laws 2007, ch 568, § 18. The legislature made those amendments retroactive. *See* Or Laws 2007, ch 568, § 21 (amendments apply to all tax years beginning on or after January 1, 1999). It does not appear, however, that the amendments made any substantive changes to the statutes that are relevant to this case, and neither party has suggested otherwise. Accordingly, we will follow the convention used by the parties and the Tax Court and cite to the 2005 version.

and required taxpayer to repay part of the tentative refund that it had received for that year. The report did not adjust taxpayer's 1999 taxes in any other way.[3]

After the IRS issued its 2005 report, taxpayer filed an amended 1999 tax return for Oregon. In that return, taxpayer claimed a net capital loss carryback based on the reduced net capital loss reflected in the 2005 IRS report and applied it against taxpayer's 1999 Oregon tax obligation.

The department permitted taxpayer to apply the net capital loss carryback against its 1999 tax obligation, but it also concluded that the IRS's 2005 adjustment of taxpayer's net capital loss carryback reopened the entirety of taxpayer's 1999 Oregon tax return for audit. The department conducted an audit and determined (among other things) that taxpayer should have included the $590 million in the sales factor used to apportion business income between states. Although taxpayer would have been entitled to a refund for its net capital loss carryback in the amount of approximately $370,000, the department assessed an additional $3.7 million in tax obligation based primarily on the recalculated sales factor. As a consequence, instead of receiving a refund, taxpayer owed net taxes of approximately $3.3 million.

Taxpayer challenged the department's assessment by filing a complaint in the Tax Court. Taxpayer moved for partial summary judgment, arguing that the statute of limitations barred the department from assessing any additional tax and that the $590 million should not be included in the sales factor. The department countered with a cross-motion for summary judgment. The department maintained that the actions by the IRS in 2005 had restarted the statute of limitations for the 1999 tax year and that the relevant statutes required the $590 million to be included in the sales factor.

The Tax Court granted taxpayer's motion for partial summary judgment and denied the department's cross-motion. The parties then entered into a settlement agreement

---

[3] The revised first stipulation of facts that the parties filed with the Tax Court stated: "The adjustments made by the IRS with respect to the 1999 Tax Year resulted entirely from the IRS's reduction of the 2002 Tax Year net capital loss."

that resolved the issues between the parties, but allowed the department to appeal the two issues resolved against it on summary judgment. The Tax Court then entered a general judgment memorializing the terms of the settlement. The department appeals.

For the reasons that follow, we agree with taxpayer that the $590 million should not be included in the sales factor. As a result, it is not necessary for us to resolve the statute of limitations issue. Even if the department were correct that the actions that the IRS took in 2005 reopened the entirety of taxpayer's 1999 Oregon tax return for audit, the department's argument would fail on its merits. *See, e.g., Harding v. Bell*, 265 Or 202, 210, 508 P2d 216 (1973) (court's conclusion that complaint failed to state claim for relief "renders unnecessary any discussion of plaintiffs' remaining assignments of error concerning * * * the statute of limitations in this type of action").

The substantive tax issue that we address concerns how to apportion business income under Oregon's version of the Uniform Division of Income for Tax Purposes Act ("UDITPA"), ORS 314.605 - 314.675 (1999).[4] The uniform act exists to ensure that a taxpayer doing business across state boundaries has all of its income taxed, but that no income is taxed twice by different states. *See Twentieth Century-Fox Film v. Dept. of Rev.*, 299 Or 220, 226-27, 700 P2d 1035 (1985) (drafter of UDITPA explained that "'[t]he uniform act, if adopted in every state having a net income tax or a tax measured by net income, would assure that 100 per cent of income, and no more or no less, would be taxed'" (quoting William J. Pierce, *The Uniform Division of Income for State Tax Purposes*, 35 Taxes 747, 748 (1957))).

UDITPA provides for two ways in which income is attributed to a state for tax purposes: by allocation and by apportionment. That distinction is, we believe, helpful to place the issue here in the correct legal framework.

---

[4] Unless otherwise noted, we refer to the 1999 version of that act and the associated administrative rules because those were the versions in effect when taxpayer sold its printer division. Unless otherwise noted, all of our other references to the Oregon Revised Statutes or the Oregon Administrative Rules are to the 1999 version of those statutes and rules for the same reason.

Allocation occurs when certain types of income (identified below) are directly attributed to (usually) a single state:

> "When income is allocated, it is attributed to the particular state or states that are considered to be the source of the income, often on the basis of the location of the property that gave rise to the income or on the basis of the taxpayer's commercial domicile."

Jerome R. Hellerstein, Walter Hellerstein, and John A. Swain, 1 *State Taxation* ¶ 9.02, 9-16 (3d ed 2011) (footnote omitted); *see* OAR 150-314.610(1)-(A)(3) ("'Allocation' refers to the assignment of nonbusiness income to a particular state."). The Oregon UDITPA statutes addressing allocation are found at ORS 314.625 through ORS 314.645, and they require allocating to Oregon such categories of income as rents and royalties from real property in this state, ORS 314.630, and interest and dividends when the taxpayer's commercial domicile is in this state, ORS 314.640.

Apportionment, by contrast, occurs when other types of income (again identified below) are aggregated, with each state entitled to tax the proportionate share of the income attributable to that state:

> "When income is apportioned, *** it is divided among the various states in which the taxpayer derives such apportionable income. The mechanism for apportioning income among the states under UDITPA, for example, is its once-familiar *** three-factor formula of property, payroll, and sales. Under this formula, a taxpayer's income is attributed to the state on the basis of a percentage determined by averaging the ratios of the taxpayer's property, payroll, and sales within the state to its property, payroll, and sales everywhere."

Hellerstein, 1 *State Taxation* ¶ 9.02 at 9-16 (footnotes omitted); *see* OAR 150-314.610(1)-(A)(2) ("'Apportionment' refers to the division of business income between states by the use of a formula containing apportionment factors."). The Oregon UDITPA statutes setting out the formula for apportioning income are ORS 314.650 through ORS 314.665.

The two different ways of treating income—allocation and apportionment—generally are signaled in UDITPA by the classifications "nonbusiness income" and "business income." *See Crystal Communications, Inc. v. Dept. of Rev.*, 353 Or 300, 304-05, 297 P3d 1256 (2013) ("Under UDITPA, whether income is allocated to a single state or apportioned among several depends on whether that income is classified under the statute as 'business income' or 'nonbusiness income.'"). Nonbusiness income is allocated; business income is apportioned. *Id.* at 305 (so noting); Hellerstein, 1 *State Taxation* ¶ 9.02 at 9-17 ("Under UDITPA and similar taxing regimes, all 'business income' is apportioned; all 'nonbusiness income' is allocated." (Footnote omitted.)); *see* ORS 314.650(1) ("All business income shall be apportioned to this state by multiplying the income by a fraction ***."); OAR 150-314.610(1)-(A)(2), (3) (defining "apportionment" to apply to business income and "allocation" to apply to nonbusiness income).[5]

This case concerns the apportionment of business income. The term "business income" is defined as follows:

> "'Business income' means income arising from transactions and activity in the regular course of the taxpayer's trade or business and includes income from tangible and intangible property if the acquisition, the management, use or rental, and the disposition of the property constitute integral parts of the taxpayer's regular trade or business operations."

ORS 314.610(1).

Business income is apportioned among the relevant states using a formula—basically, one in which the total business income is multiplied by a fraction representing the share of income that can properly be attributed to each state. In 1999, that fraction was determined using three factors: the property factor, the payroll factor, and the sales factor.

---

[5] The main statute regarding allocation, ORS 314.625, does not specifically state that it applies to *all* nonbusiness income; rather, it requires allocation for "[r]ents and royalties from real or tangible personal property, capital gains, interest, dividends, patent or copyright royalties, or prizes awarded by the Oregon State Lottery, *to the extent that they constitute nonbusiness income.*" (Emphasis added.) That does create the theoretical possibility that certain types of nonbusiness income may be neither allocated nor apportioned, though Hellerstein rejects that notion. Hellerstein, 1 *State Taxation* ¶ 9.14 at 9-164 - 9-165. Regardless, it is clear that business income is always apportioned. ORS 314.650(1).

ORS 314.650(1).[6] Each factor was itself a fraction. ORS 314.655(1) (defining property factor); ORS 314.660(1) (defining payroll factor); ORS 314.665(1) (defining sales factor).

The specific issue in this case involves how to calculate the sales factor. As noted, the sales factor represents the proportion of a taxpayer's Oregon sales to the taxpayer's total sales:

> "The sales factor is a fraction, the numerator of which is the total sales of the taxpayer in this state during the tax period, and the denominator of which is the total sales of the taxpayer everywhere during the tax period."

ORS 314.665(1).

"Sales" is statutorily defined as follows:

> "'Sales' means all gross receipts of the taxpayer not allocated under ORS 314.615 to 314.645."

ORS 314.610(7).[7] The statute that sets out the method for calculating the sales factor, ORS 314.665, further refines the definition of "sales" as follows:

> "(6) For purposes of this section, 'sales':

> "(a) Excludes gross receipts arising from the sale, exchange, redemption or holding of intangible assets, including but not limited to securities, unless those receipts are derived from the taxpayer's primary business activity.

---

[6] ORS 314.650(1) (1999) provided:

> "All business income shall be apportioned to this state by multiplying the income by a fraction, the numerator of which is the property factor plus the payroll factor plus two times the sales factor, and denominator of which is four."

The current version of ORS 314.650 no longer uses the property or payroll factors; apportionment is based entirely on the sales factor.

[7] Because the term "sales" does not apply to income that is allocated, it necessarily applies only to apportioned income. Thus, "sales" is a subcategory of business income, which is apportioned under UDITPA. Hellerstein, 1 *State Taxation* ¶ 9.18 at 9-246 n 931 (because definition of "sales" includes only gross receipts that are "not allocated," it means, by negative inference, that "sales" includes "all 'apportioned' gross receipts"); *id.* ¶ 9.02 at 9-17 ("all" business income is apportioned, while "all" nonbusiness income is allocated); *see* ORS 314.650(1) ("[a]ll business income shall be apportioned to this state" using the three-factor formula); OAR 150-314.665(1)-(A)(1) (defining "sales" to include the requirement for "business income" that the gross receipts be derived from transactions or activity in regular course of taxpayer's trade or business).

> "(b)  Includes net gain from the sale, exchange or redemption of intangible assets not derived from the primary business activity of the taxpayer but included in the taxpayer's business income.
>
> "(c)  Excludes gross receipts arising from an incidental or occasional sale of a fixed asset or assets used in the regular course of the taxpayer's trade or business if a substantial amount of the gross receipts of the taxpayer arise from an incidental or occasional sale or sales of fixed assets used in the regular course of the taxpayer's trade or business."

ORS 314.665(6)(a) - (c).

The issue on appeal concerns the intangible assets exclusion rule found in ORS 314.665(6)(a). That paragraph begins by excluding from the sales factor those "gross receipts arising from the sale * * * of intangible assets," but follows that exclusion with an "unless" clause; that "unless" clause indicates that some gross receipts from the sale of intangible assets *are* considered to be sales. Specifically, if gross receipts from the sale of intangible assets are "derived from the taxpayer's primary business activity," then, by implication, those receipts do constitute sales for purposes of calculating the sales factor.[8]

Having outlined the applicable regulatory framework, we turn to the parties' arguments in the Tax Court and the Tax Court's decision. The department's position in the Tax Court and on appeal is that the $590 million—which both parties assume constituted "business income" under ORS 314.610(1)—constitutes "sales" for purposes of calculating the sales factor under ORS 314.665(1). Therefore, the

---

[8] The department has promulgated a rule that incorporates many of those same concepts. After recapping the statutory definition of the term "sales," OAR 150-314.665(1)-(A)(1) provides, in part:

"Thus, for the purposes of the sales factor of the apportionment formula for each trade or business of the taxpayer, the term 'sales' means all gross receipts derived by a taxpayer from transactions and activity in the regular course of such trade or business. The term 'sales' excludes gross receipts arising from the sale, exchange, redemption or holding of intangible assets, including but not limited to securities, unless those receipts are derived from the taxpayer's primary business activity."

The first quoted sentence of the rule reflects the first part of the definition of "business income" in ORS 314.610(1) ("transactions and activity in the regular course of the taxpayer's trade or business"). The second sentence essentially repeats the exclusion and "unless" clause found in ORS 314.665(6)(a).

department reasons, that sum should have been included in both the numerator and the denominator of the sales factor fraction. Taxpayer maintains that the $590 million should not be included in either the numerator or the denominator of the sales factor, because it is specifically excluded from "sales" by ORS 314.665(6)(a).[9]

Including the $590 million in the sales factor would directly impact the apportionment formula. When that amount is included in the numerator and the denominator of the sales factor, it increases the size of the fraction.[10] A larger fraction increases the proportion of business income that Oregon can tax. In this case, taxpayer omitted the $590 million when it calculated the sales factor and arrived at a fraction equal to 6.9162 percent. In 2006, the department recalculated the sales factor, including the $590 million (plus some other sums not at issue), and arrived at a fraction equal to 34.3678 percent.

In the Tax Court, the department relied entirely on ORS 314.665(6)(a) to support its assertion that the $590 million constituted "sales," and it continues to rely on that statutory provision on appeal.[11] The department argued that the $590 million constituted gross receipts from the sale of intangible assets that, although initially *excluded* from the sales factor, is included here under the "unless" clause (which indicates that some gross receipts from the sale of

---

[9] Alternatively, taxpayer maintains that the $590 million should not be included in calculating the sales factor, because it does not represent "sales" as the department has defined that term in OAR 150-314.665(1)-(A)(1). Because we agree with taxpayer's interpretation of the statute, we do not reach its alternative rule-based argument.

[10] When the same positive, nonzero number is added to both the numerator and denominator of a fraction, it will make the fraction bigger, as long as the starting fraction is less than one. For example, adding one to the numerator and denominator of 1/2 produces the fraction 2/3 (50% becomes 66 2/3%). Adding one to the numerator and denominator of 3/4 produces the fraction 4/5 (75% becomes 80%).

[11] In the department's original explanation of its adjustments to the 1999 tax year, it invoked ORS 314.665(6)(b), which provides that the sales factor includes "net gain from the sale *** of intangible assets not derived from the primary business activity of the taxpayer but included in the taxpayer's business income." By the time the case reached the Tax Court, however, the department had shifted its position and relied exclusively on ORS 314.665(6)(a), disclaiming any reliance on ORS 314.665(6)(b). Similarly, the department has not sought to rely on ORS 314.665(6)(b) in this court.

intangible assets are considered to be sales). Specifically, the department contended that the printer division was central to taxpayer's primary business activity and, accordingly, that the proceeds from the sale of that division—including the $590 million for intangible assets—constituted "receipts * * * derived from the taxpayer's primary business activity."

In support of its motion for summary judgment, taxpayer agreed with the department that the $590 million constituted gross receipts from intangible assets under ORS 314.665(6)(a), but it maintained that the $590 million was not derived from taxpayer's primary business activity. Therefore, taxpayer argued, the "unless" clause does not apply, and the receipts are excluded under ORS 314.665(6)(a).

The Tax Court ultimately held for taxpayer. Based largely on legislative history and other sources, the court concluded that the exclusion of "intangible assets" found in ORS 314.665(6)(a) refers only to "liquid assets"—those assets "'(other than functional currency or funds held in bank accounts) held to provide a relatively immediate source of funds to satisfy the liquidity needs of the trade or business.'" 2012 Ore Tax LEXIS 175, *48-*63; *see id.* at *53 (quoting Multistate Tax Commission Allocation and Apportionment Reg. IV.18.(c).(4)(B)). The statutory purpose of ORS 314.665(6)(a), the court concluded, was to address what is known as the "treasury function" problem, in which a corporation that needs to store cash for a short period "parks" it in short-term securities or investments until the cash is needed in the ordinary course of business.[12] Considering sales of those "liquid assets" as gross receipts could skew the sales factor in favor of the state where the corporation was headquartered, because that would usually be where the sales took place, and the legislature therefore intended to exclude receipts from such "liquid assets" from the definition of "sales." 2012 Ore Tax LEXIS 175, *48-*50,

---

[12] The "treasury function" is "'the pooling and management of liquid assets for the purpose of satisfying the cash flow needs of the trade or business, such as providing liquidity for a taxpayer's business cycle, providing a reserve for business contingencies, business acquisitions, etc.'" 2012 Ore Tax LEXIS 175, *53 (quoting Multistate Tax Commission Allocation and Apportionment Reg. IV.18. (c).(4)(C)); *see also* Hellerstein, 1 *State Taxation* ¶ 9.18[4][c] (discussing "treasury function" problem and cases).

*54. Because the receipts for the sale of the printer division, including the $590 million, did not derive from "liquid assets," the Tax Court concluded that ORS 314.665(6)(a) had no application to the $590 million. That holding necessarily implied that the $590 million was not excluded from the definition of "sales" by ORS 314.665(6)(a) and was, therefore, included within the general definition in ORS 314.610(7) of "sales" as gross receipts. Nevertheless, the Tax Court held for taxpayer on other grounds.[13]

On appeal, the department asserts that the Tax Court erred by incorrectly interpreting the term "intangible assets" in ORS 314.665(6)(a). We agree.

We begin by noting that the Tax Court did not follow our familiar paradigm for statutory analysis summarized in *State v. Gaines*, 346 Or 160, 206 P3d 1042 (2009). The court did not focus its analysis on the text or context of ORS 314.665(6)(a), but primarily considered only its legislative history. 2012 Ore Tax LEXIS 175, *48-*63; *compare Gaines*, 346 Or at 171 ("text and context remain primary, and must be given primary weight in the analysis").

We begin instead with the statutory text. The legislature used the term "intangible assets," which has a well-defined and therefore applicable legal meaning. *See Gaston v. Parsons*, 318 Or 247, 253, 864 P2d 1319 (1994) ("[W]ords in a statute that have a well-defined legal meaning are to be given that meaning in construing the statute." (Citations omitted.)). "Intangible asset" broadly means "[a]ny nonphysical asset or resource tha[t] can be amortized or converted to cash, such as patents, goodwill, and computer programs, or a right to something, such as services paid for in advance." *Black's Law Dictionary* 134 (9th ed 2009). Intangible assets also are defined as:

> "In general, property representative of a right rather than a physical object. Patents, stocks, bonds, goodwill, trademarks, franchises, and copyrights are examples of intangible assets."

---

[13] The Tax Court concluded that the $590 million was excluded from the sales factor by OAR 150-314.665(4)(3)(b) as "'business income from intangible property [that] cannot readily be attributed to any particular income producing activity of the taxpayer.'" 2012 Ore Tax LEXIS 175, *65-*72 (quoting the administrative rule).

*West's Tax Law Dictionary* 570 (2013). While those definitions may be somewhat open-ended, we need not fully explicate them in this case: Neither the parties nor the Tax Court dispute the conclusion that the $590 million derived from "intangible assets" as that term is commonly used. *See* 2012 Ore Tax LEXIS 175, \*5, \*7, \*61 (characterizing the assets from which the $590 million were derived as "intangible assets").

We must consider, then, whether other statutory text or context suggests that "intangible assets," as used in ORS 314.665(6)(a), carries the significantly narrower meaning identified by the Tax Court. The additional phrase that follows the term "intangible assets"—"including but not limited to securities"—does not limit the meaning of the term. Neither do the parties identify any other statutory text or context to support a narrow reading of "intangible assets."

We therefore address the legislative history that the parties presented to the Tax Court and on which the Tax Court relied. *See* ORS 174.020(1)(b), (3) (permitting parties to offer legislative history to court, which court will give weight it deems appropriate). In doing so, we note that "a party seeking to overcome seemingly plain and unambiguous text with legislative history has a difficult task before it." *Gaines*, 346 Or at 172.

> "Legislative history may be used to confirm seemingly plain meaning and even to illuminate it; a party also may use legislative history to attempt to convince a court that superficially clear language actually is not so plain at all— that is, that there is a kind of latent ambiguity in the statute. \*\*\* When the text of a statute is truly capable of having only one meaning, no weight can be given to legislative history that suggests—or even confirms—that legislators intended something different."

*Id.* at 172-73 (footnotes omitted).

The Tax Court cited three aspects of the legislative history to support its reading of ORS 314.665(6)(a). First, the Tax Court cited hearings before the legislature when ORS 314.665(6)(a) was adopted in 1995. Or Laws 1995, ch 176, § 1. At those hearings, a witness testified as follows:

"What [the amendment adding ORS 314.665(6)(a)] means is if a business *for example* has a cash account and \*\*\* they maintain securities and earn interest and they sell those and buy new ones \*\*\*, well that really isn't their business, the question is, well, every time they sell those securities, is that included in the sales factor or not. This would exclude those types of sales."

Tape Recording, House State and School Finance Committee, HB 2203, Apr 25, 1995, Tape 186, Side A (statement of Steve Bender, Legislative Revenue Office) (emphasis added).

That testimony does indicate that ORS 314.665(6)(a) was intended to address the "treasury function" problem. And we agree that ORS 314.665(6)(a) does in fact address the "treasury function" problem: gross receipts from the sale of short-term liquid assets that a corporation used to store cash for business purposes fall within the meaning of the term "intangible assets," because such receipts are nonphysical assets that can be converted to cash. Such receipts do not fall within the "unless" clause of ORS 314.665(6)(a), because a taxpayer's primary business activity, almost by definition, will not be the storage of cash to satisfy the liquidity needs of the taxpayer's business. That said, the legislative history does not demonstrate any intent to *limit* ORS 314.665(6)(a) to addressing the "treasury function" problem. The legislature's decision to address a narrow problem with a broader solution is not unusual:

"Statutes ordinarily are drafted in order to address some known or identifiable problem, but the chosen solution may not always be narrowly confined to the precise problem. The legislature may and often does choose broader language that applies to a wider range of circumstances than the precise problem that triggered legislative attention. \*\*\* When the express terms of a statute indicate such broader coverage, it is not necessary to show that this was its conscious purpose."

*South Beach Marina, Inc. v. Dept. of Rev.*, 301 Or 524, 531, 724 P2d 788 (1986) (footnote omitted).

Second, in support of its conclusion that "intangible assets" means only "liquid assets," the Tax Court cited the model regulation adopted by the Multistate Tax Commission

that limited UDITPA to those assets. 2012 Ore Tax LEXIS 175, \*52-\*55 (quoting Multistate Tax Commission Allocation and Apportionment Reg. IV.18.(c).(4)). However, that model regulation was not propounded until 1997, and therefore it could not have influenced the legislature's 1995 decision to adopt ORS 314.665(6)(a). Furthermore, although ORS 314.605(2) provides that Oregon's version of UDITPA should be "construed as to effectuate its general purpose to make uniform the law of those states which enact it," ORS 314.665(6)(a) has no counterpart in UDITPA. Thus, the legislature's general instruction to construe the law uniformly does not give us guidance: We are construing a statutory provision that is not found in UDITPA. *See State ex rel. Juv. Dept. v. Ashley*, 312 Or 169, 179, 818 P2d 1270 (1991) ("We generally give meaning to the difference between an Oregon statute and the statute or model code from which it was borrowed." (Citations omitted.)).

Finally, the Tax Court relied on 1999 testimony before the legislature that indirectly suggested that "intangible assets" in ORS 314.665(6)(a) might mean only "liquid assets." *See* 2012 Ore Tax LEXIS 175, \*55-\*56 (department represented to the legislature that additional legislation would bring Oregon into line with Multistate Tax Commission model regulation). That later testimony is irrelevant. "The views legislators have of existing law may shed light on a new enactment, but it is of no weight in interpreting a law enacted by their predecessors." *DeFazio v. WPPSS*, 296 Or 550, 561, 679 P2d 1316 (1984) (discussing testimony before legislature about existing law); *see also South Beach Marina, Inc.*, 301 Or at 531 n 8 ("A later legislature's interpretation of an earlier legislature's intent may be incorrect.").

We therefore agree with the department that the Tax Court erred in concluding that "intangible assets" in ORS 314.665(6)(a) means only "liquid assets."

As we noted previously, the $590 million at issue derived from various property interests that fit within the well-defined legal meaning of "intangible assets," and the parties do not disagree. Therefore, under the plain text of ORS 314.665(6)(a), those receipts must be excluded from the sales factor *unless* the $590 million is "derived from the

taxpayer's primary business activity," as the department argued in the Tax Court.

Although the department did not brief that argument in this court, its theory in the Tax Court was that the $590 million derived from taxpayer's primary business activity because

> "[t]he goodwill at issue in this case was developed by [taxpayer] over many years, in the operation of its Color Printing Division. * * * [T]he Color Printing Division was central to [taxpayer's] primary business of manufacturing and distributing electronics products."

Taxpayer disputes that analysis and asserts that the uncontradicted evidence showed that taxpayer was in the business of manufacturing and selling tangible personal property—electronics equipment. *See* 2012 Ore Tax LEXIS 175, *3, *7 (so stating). Taxpayer accordingly contends that, because it did not receive the $590 million from the manufacture and sale of electronics equipment, the $590 million did not "derive[] from the taxpayer's primary business activity."

We agree with taxpayer. The fact that the printer division was central to taxpayer's primary business—manufacturing and distributing electronic products—does not mean that the sale of that division was itself taxpayer's primary business activity. The parties stipulated in the Tax Court that taxpayer "is a worldwide leading developer of test, measurement and monitoring equipment,"[14] and the department represented to the Tax Court that taxpayer's "primary business" was "manufacturing and distributing electronics products." The sale at issue here was not the sale

---

[14] The record includes taxpayer's Form 10-K filed with the United States Securities and Exchange Commission for the fiscal year ending in May of 1999. That form summarized taxpayer's business as follows:

> "Tektronix manufactures and distributes electronic products within three broad segments through three major business divisions: Measurement, Color Printing and Imaging, and Video and Networking. Measurement products include a broad range of instruments designed to allow an engineer or technician to view, measure, test or calibrate electrical circuits, mechanical motion, sound or radio waves. Color Printing and Imaging products include a comprehensive line of computer network capable color printers, ink and related supplies. Video and Networking products include video distribution, production, storage and newsroom automation products."

of such products, but the sale of an entire division of taxpayer's business. The department did not adduce any evidence that taxpayer's primary business was engaging in the sale of its divisions, and there is no basis for concluding otherwise.[15]

Consequently, we agree with taxpayer that the $590 million must be excluded from the sales factor under ORS 314.665(6)(a). Those receipts resulted from the sale of intangible assets that were not derived from taxpayer's primary business activity.

In summary, we conclude that the decision of the Tax Court should be affirmed, albeit on alternative grounds. We reject the Tax Court's conclusion that "intangible assets" in ORS 314.665(6)(a) means only "liquid assets," and we instead hold that the term carries its ordinary legal meaning. Because the $590 million at issue here derived from a one-time sale of intangible assets, it is excluded from the definition of "sales" under ORS 314.665(6)(a) and is not included in that definition under the "unless" clause of that statute; the $590 million did not derive from this taxpayer's primary business activity.

The judgment of the Tax Court is affirmed.

---

[15] The department has since promulgated an administrative rule that lists seven criteria to be used to determine a taxpayer's primary business activity. OAR 150-314.665(6)(3) (effective December 31, 2000). Neither party asserts that that rule applies to this case or would affect the proper resolution of this issue.