IN THE OREGON TAX COURT
MAGISTRATE DIVISION
Corporation Excise Tax

CHEVRON U.S.A. INC. a Pennsylvania )
Corporation, )
 )
        Plaintiff, )   TC-MD 190031N
 )
  v. )
 )
DEPARTMENT OF REVENUE, )
State of Oregon, )   **ORDER ON SECOND CROSS**
 )   **MOTIONS FOR SUMMARY**
        Defendant. )   **JUDGMENT**

This matter came before the court on the parties' second cross motions for summary

judgment concerning the inclusion of Plaintiff's gross receipts from its commodities hedging in

the sales factor under ORS 314.665(6). Oral argument was held in the courtroom of the Oregon

Tax Court on November 29, 2022. California attorneys Carley A. Roberts and Robert P. Merten,

III appeared *pro hac vice* on behalf of Plaintiff. Marilyn J. Harbur and Daniel Paul, Senior

Assistant Attorneys General, appeared on behalf of Defendant.

I. PROCEDURAL HISTORY

The parties previously filed cross motions for summary judgment on the issues of 1)

whether Plaintiff's hedging receipts arose from the "sale, exchange, redemption or holding of

intangible assets" under ORS 314.665(6)(a); and, if so, 2) whether those receipts derived from

Plaintiff's "primary business activity" under ORS 314.665(6)(a).[1] In an Order entered April 14,

2021, the court granted Defendant's Motion for Summary Judgment with respect to the first

issue and denied its motion with respect to the second issue, based on Plaintiff's contention that

---

[1] The tax years at issue are 2011, 2012, and 2013. The court's references to the Oregon Revised Statutes
(ORS) are to 2009. Although the 2011 edition of the ORS is applicable to the 2012 and 2013 tax years, the relevant
statutes are the same as the 2009 edition.

issues of material fact existed with respect to the second issue. The present cross motions concern the second issue: whether Plaintiff's hedging receipts derived from its primary business activity within the meaning of ORS 314.665(6)(a). The court hereby incorporates the facts and analysis set forth in its first Order on Cross Motions for Summary Judgment. To the extent the parties present new facts and arguments, those are set forth below.

## II.  STATEMENT OF FACTS

As the court previously found, Plaintiff was engaged in a fully integrated petroleum business, which included "upstream operations" consisting primarily of exploring, developing, producing, and transporting crude oil and natural gas, as well as "downstream operations" consisting primarily of refining, manufacturing, and marketing refined products and other commodities. (Order on [First] Cross Mots for Summ J at 1.) Plaintiff used derivative commodity instruments – primarily futures, options, and swaps – to manage risks related to the price volatility of crude oil and other petroleum products. (*Id.* at 2.) Those activities were part of Plaintiff's hedging program, resulting in the receipts at issue. (*Id.* at 3.) Plaintiff's "financial traders" were responsible for hedging transactions, whereas its "physical traders" were responsible for purchases and sales of crude oil and refined products. (*Id.*)

There are numerous types of crude oil – for instance, "light, sweet" as compared to "heavy, sour" – and they serve different purposes. (Ptf's Mot at 5-6.) Due to that variety, Plaintiff sold 85 to 90 percent of its upstream production to third parties and had to purchase 85 to 90 percent of its crude oil feedstock for downstream operations. (*Id.*) Plaintiff's supply and trading workforce, including physical and financial traders, was essential to its operations, managing "daily commodity sales and purchases of approximately five million barrels of liquids and five billion cubic feet of natural gas." (*Id.* at 4.)

Plaintiff's financial traders worked closely with its physical traders. (Ptf's Mot at 4-5.) The type, structure, and timing of a hedging transaction "was based on information provided by the physical traders * * *." (*Id.*) "It is the physical trader who instructs the financial trade." (Ptf's Reply at 9.) The hedging transactions were entered "side-by-side" with physical transactions to meet Plaintiff's "defined and accepted level of pricing risk." (Ptf's Mot at 7.) Plaintiff was "required" to enter hedging transactions "as a pricing mechanism for the sales and purchases of physical commodities." (*Id.* at 8.) Perhaps stating this point another way, Plaintiff alleged that the hedging transactions were necessary for Plaintiff "to price and in turn sell and purchase" physical commodities. (Ptf's Reply at 7.) Plaintiff further alleged that "some segments of the market required entering * * * hedging transactions in conjunction with a physical sale or purchase in order to participate in the desired physical sale or purchase." (Ptf's Mot. at 8, 10.) Plaintiff was unable to further explain or clarify that allegation at oral argument.

Plaintiff's " 'primary objective' was to create shareholder value and achieve sustained financial returns." (Ptf's Mot at 3.) For that reason, Plaintiff's traders were required "to maximize [Plaintiff's] enterprise value by taking advantage of trading opportunities to best leverage [Plaintiff's] assets." (*Id.* at 9.) In practice, that might mean structuring a trade to use Plaintiff's assets rather than a third party's even if it would result in lower direct earnings in the trader's personal trading book. (*Id.*[2]) Plaintiff's hedging transactions "would be arbitrary and without meaning" when viewed in isolation. (*Id.* at 10.)

### III. ANALYSIS

The issue presented for the 2011, 2012, and 2013 tax years is whether Plaintiff's hedging receipts derived from its primary business activity under ORS 314.665(6)(a). Plaintiff maintains

---

[2] Plaintiff did not quantify this distinction in terms of dollars or numbers of trades.

ORDER ON SECOND CROSS MOTIONS FOR SUMMARY JUDGMENT  TC-MD 190031N

that the hedging receipts were inextricably linked to and inseparable from physical commodity purchases and sales; therefore, the receipts derived from its primary business activity. (*See* Ptf's Mot at 18-19.) Defendant views Plaintiff's hedging program as a distinct and separate business activity from its primary business activity of "developing and producing crude oil and natural gas and refining and marketing those products for sale." (Def's Mot at 3.) Defendant characterizes the purpose of Plaintiff's hedging program as "risk management." (*Id.* at 8.)

The court grants a motion for summary judgment if all the documents on file "show that there is no genuine issue as to any material fact and that the moving party is entitled to prevail as a matter of law." Tax Court Rule (TCR) 47 C. "No genuine issue as to a material fact exists if, based upon the record before the court viewed in a manner most favorable to the adverse party, no objectively reasonable juror could return a verdict for the adverse party * * *." *Id.* The parties appear to agree that no material facts are in dispute. (Ptf's Mot at 1; Def's Mot at 15.[3])

A.      *Overview of Legal Standard: Receipts Derived from Primary Business Activity*

As explained in the first Order, "gross receipts arising from the sale, exchange, redemption or holding of intangible assets, including but not limited to securities," are excluded from taxpayer's apportionable sales "unless those receipts are derived from the taxpayer's primary business activity." ORS 314.665(6)(a). The court previously concluded that Plaintiff's hedging receipts were "gross receipts arising from the sale, exchange, redemption or holding of intangible assets." (*See* Order on [First] Cross Mots for Summ J at 17.) Thus, the gross receipts must be excluded from Plaintiff's sales factor unless they were "derived from [Plaintiff's] primary business activity."

---

[3] In Defendant's view, Plaintiff "had ample opportunity to present 'facts' to support [its] position, but" "failed to provide much information" in response to Defendant's discovery requests pertaining to factors used to determine whether an activity is a company's primary business activity. (Def's Mot at 14.)

Because the phrase "primary business activity" is not defined by statute, this court in *Oracle Corp. v. Dept. of Rev.*, 24 OTR 359, 389 (2021) considered its meaning under Oregon's framework for statutory interpretation.[4]  When ORS 314.665(6) was enacted in 1995, the plain meaning of "primary" was "first, chief, or principal" and required a comparison of at least two activities under the statute.  *Id.* at 389-90 (internal quotation marks omitted).  Relevant definitions of activity "connoted a degree of movement or exertion of energy."  *Id.* at 390.[5] Context provided by Uniform Division of Income for Tax Purposes Act (UDITPA) indicated that "activity" meant "a fairly high-level description of something the taxpayer did in its business." *Id.* at 391.  For instance, "acting as a bank, an investment company, or an insurance company; or the transmission of communications, the transportation of goods or persons, or the production, storage, transmission, sale, delivery or furnishing of electricity, water, gas or certain other commodities."  *Id.* (internal quotation marks omitted).  The court found that the plain meaning of "derived from" overlapped substantially with the term "arising from[,]" each of which was a synonym for "originate."  *Id.* at 388-89.  Both the plain and legal meanings of "derived from" direct the court to look to a "specified source," which is the "primary business activity."  *Id*.

In *Tektronix, Inc. v. Dept. of Rev.*, the Oregon Supreme Court concluded that taxpayer's sale of goodwill associated with its printer division did not derive from its primary business activity, reasoning that "taxpayer's 'primary business' was 'manufacturing and distributing electronics products'" and not "engaging in the sale of its divisions[.]"  354 Or 531, 547-48, 316 P3d 276 (2013).  In reaching that conclusion, the court rejected the department's argument that

---

[4] *State v. Gaines*, 346 Or 160, 206 P3d 1042 (2009).

[5] In *Oracle*, the court ultimately held that the mere "holding of stock" was not an "activity" – much less a "primary business activity" – within the meaning of the statute.  24 OTR at 394.  However, investing or trading in securities does appear to be an "activity" contemplated by the statute.  *See id.* at 392.

the receipts from the sale of goodwill derived from taxpayer's primary business activity because the goodwill was developed over many years of operations central to taxpayer's primary business. *Id.* at 547. "The fact that the printer division was central to taxpayer's primary business * * * does not mean that the sale of that division was itself taxpayer's primary business activity." *Id.*

B.    *Whether Plaintiff's Hedging Receipts Derived From Its Primary Business Activity*

To an extent, the parties agree on Plaintiff's primary business activity. Defendant offered "developing and producing crude oil and natural gas and refining and marketing those products for sale" and Plaintiff seems to accept that description. (Ptf's Mot at 15.[6]) At times, Plaintiff appears to expand the description to include a concept of maximizing profit or shareholder value. (*See, e.g.,* Ptf's Mot at 3 (Plaintiff's " 'primary objective' was to create shareholder value and achieve sustained financial returns"); *id.* at 14 (Plaintiff's "primary objective was to make profitable sales and purchases of * * * crude oil, natural gas, and refined products").) It is unclear how those additional objectives add any meaning. Presumably, every for-profit business seeks to make a profit and every publicly traded company seeks to maximize shareholder value. The court accepts Defendant's description of Plaintiff's primary business activity.

The parties dispute whether Plaintiff's hedging program was a distinct business activity, with Defendant advancing that position. As discussed in *Oracle*, investing or trading in securities are sufficiently "active" to meet the definition of a business activity. An "investment company" is the type of business activity contemplated by UDITPA, and that provides important context for understanding ORS 314.665(6). Thus, trading in derivative commodity instruments

---

[6] Plaintiff offers a more expansive and detailed articulation of its primary business activity in its 2011 Form 10-K. (Ptf's Ex 1 at 3; *see also* Ex 2 at 3 (2012 10-K); Ex 3 at 3 (2013 10-K).)

is the type of activity that might qualify as a primary business activity. Here, however, Plaintiff has presented evidence that the purpose of its hedging program is not simply to maximize returns on individual trades, but rather to manage price risk associated with its purchases and sales of commodities, particularly crude oil, and to best utilize Plaintiff's assets. In those respects, Plaintiff's hedging program differs from other types of investment activity.[7] (*See* Ptf's Reply at 11 (Plaintiff's hedging transactions "are not part of a cash management system, investment portfolio or treasury function.")) Defendant appears to agree, describing the purpose of Plaintiff's hedging program as "risk management." The court questions whether "risk management" is a business activity within the meaning of the statute but need not resolve that question because neither party contends that it is Plaintiff's "primary business activity."[8]

The question becomes whether Plaintiff's hedging receipts *derived from* its primary business activity. Plaintiff makes a strong case that hedging is necessary for managing price risk, particularly in the volatile petroleum industry.[9] In that respect, hedging may be integral to Plaintiff's business. But the receipts do not *derive from* or *arise from* Plaintiff's primary business activity. That is, the *source* of the hedging receipts is not developing and producing crude oil and natural gas and refining and marketing those products for sale.

As *Tektronix* illustrates, the fact that an activity is *central* to the taxpayer's primary business activity does not mean it *is* the primary business activity. The opinion in *General Mills*

---

[7] In *Tektronix*, the court described "the 'treasury function' problem, in which a corporation that needs to store cash for a short period 'parks' it in short-term securities or investments until the cash is needed in the ordinary course of business." 354 Or at 542. That is one issue addressed by ORS 314.665(6)(a), though treasury receipts are not the only category of receipts encompassed in the statutory language. *Id.* at 545.

[8] To help determine a taxpayer's "primary business activity," Defendant has promulgated a rule listing non-exhaustive criteria to consider. *See* OAR 150-314.665(6)(3) (2011). Plaintiff maintains that application of the criteria is unnecessary, and Defendant maintains that it examined the factors in its first motion. (Ptf's Reply at 3; Def's Mot at 5.) The court finds no new evidence has been presented that might change its determination.

[9] (*See* Ptf's Mot at Ex 6.)

*II* provides some useful discussion on the distinction between a hedging program and the "main line of business," selling grain, flour, and consumer food. *General Mills v. Franchise Tax Bd.*, 146 Cal Rptr 3d 475, 487-88 (1st App Dist 2012).[10]  Even though hedging served "an important and even a critical supportive function" to taxpayer's business by managing price risk, it was "only a supportive function" and "economically meaningless if separated from ultimate sales of grain, flour and consumer food products for profit." *Id.*  Thus, the taxpayer's futures sales were "qualitatively different" from its main line of business. *Id.* at 488.

Here, Plaintiff's primary business activity involved dealing in physical commodities, as indicated by Plaintiff's sale of 85 to 90 percent of its upstream production and its need to purchase 85 to 90 percent of downstream feedstock.  Plaintiff used physical commodity hedging transactions to manage market conditions due to its exposure to risks related to price volatility of crude oil, refined products, natural gas, natural gas liquids, liquefied natural gas and refinery feedstocks.  (Ptf's Mot at 6-7.)  Thus, the hedging activities, although central to Plaintiff's primary business activity, were not *the* activity, but instead played a supportive role to its primary business of purchasing and selling the physical commodities.  Just as in *General Mills II*, Plaintiff's hedging program was not a distinct "profit center."  146 Cal Rptr 3d at 488.  Indeed, the results of Plaintiff's hedging program were "not material to [Plaintiff's] financial position, results of operations or cash flows in [2011, 2012, 2013]."  (Ptf's Mot at 7 (citing SEC Form 10-Ks.))  As such, Plaintiff's hedging program activities were "qualitatively different" from its main line of business.

---

[10] Plaintiff correctly points out that *General Mills II* concerns a legal standard not at issue here.  (Ptf's Reply at 12.)  Namely, the issue was whether inclusion of futures sales distorts the standard apportionment formula such that it does not fairly represent the extent of taxpayer's business, warranting use of alternative apportionment. *General Mills II*, 146 Cal Rptr 3d at 483.  Part of that analysis asks whether the challenged activity "qualitatively differs from taxpayer's principal business." *Id.*

Plaintiff suggests that its hedging transactions may have been entered with a purpose of leveraging Plaintiff's assets to maximize enterprise value. (Ptf's Mot at 9.) As an example, Plaintiff wrote that a trader might structure a deal to use Plaintiff's pipeline rather than a third party's pipeline, even if the third-party pipeline was lower cost. (*Id.*) Unfortunately, facts relevant to those types of trades were not well-developed such that the court can determine whether some portion of Plaintiff's hedging transactions utilized its physical assets. Also, the court is unable to reconcile Plaintiff's allegation with the fact that hedging transactions rarely result in the delivery of physical commodities but are usually resolved through offset.[11] The court finds insufficient evidence to support a finding that any or all of Plaintiff's hedging receipts derived from its primary business activity of developing and producing crude oil and natural gas and refining and marketing those products for sale.

As a final check on the conclusion that Plaintiff's hedging receipts do not derive from Plaintiff's primary business, the court refers to its discussion of the legislative history of ORS 314.665(6). (*See* Order on [First] Cross Mots for Summ J at 14-15.) Although Plaintiff's hedging program serves a different purpose than cash management, the court found that "Plaintiff's hedging receipts may create the same distortion problem * * * given the number of such transactions and the resulting quantity of gross receipts. Excluding Plaintiff's gross hedging receipts under ORS 314.665(6)(a) is consistent with the legislative intent of that statute." (*Id.* at 15.) The evidence and arguments Plaintiff presented do not lead the court to a different conclusion.

///

///

---

[11] (*See* Order on [First] Cross Mots for Summ J at 11-12, 14.)

## IV. CONCLUSION

Plaintiff's primary business was developing and producing crude oil and natural gas and refining and marketing those products for sale. Its hedging program played an important, and perhaps integral, supportive function. Nevertheless, receipts from Plaintiff's hedging program did not derive from its primary business activity. Now, therefore,

IT IS ORDERED that Plaintiff's Motion for Summary Judgment is denied.

IT IS FURTHER ORDERED that Defendant's Motion for Summary Judgment is granted.

Dated this _____ day of May 2023.

_____
ALLISON R. BOOMER
PRESIDING MAGISTRATE

***This is a <u>dispositive order</u> pursuant to Tax Court Rule – Magistrate Division 16 C(1). The court will issue a decision after waiting 14 days to determine whether there is a dispute about costs and disbursements. Any claim of error in regard to this order should be raised in an appeal of the Magistrate's decision when all issues have been resolved. See TCR-MD 19.***

***This document was signed by Presiding Magistrate Allison R. Boomer and entered on May 17, 2023.***