IN THE OREGON TAX COURT
MAGISTRATE DIVISION
Corporation Excise Tax

ABC INC. AND COMBINED AFFILIATES, )
)
           Plaintiff, )  TC-MD 170364N
)
     v. )
)  **ORDER ON PLAINTIFF'S MOTION**
DEPARTMENT OF REVENUE, )  **FOR PARTIAL SUMMARY**
State of Oregon, )  **JUDGMENT and DEFENDANT'S**
)  **CROSS MOTION FOR SUMMARY**
          Defendant. )  **JUDGMENT**

This matter came before the court on Plaintiff's Motion for Partial Summary Judgment (Plaintiff's Motion), filed February 25, 2019. Defendant filed a Response to Plaintiff's Motion and Cross-Motion for Summary Judgment (Defendant's Cross-Motion) on April 24, 2019. Plaintiff filed its Reply on July 1, 2019, and Defendant filed its Reply on July 18, 2019. Oral argument was held in the courtroom of the Oregon Tax Court on July 30, 2019. Jeffrey M. Vesely, a California attorney admitted pro hac vice, appeared on behalf of Plaintiff. Marilyn J. Harbur (Harbur), Senior Assistant Attorney General, appeared on behalf of Defendant.

I.      STATEMENT OF FACTS

For the tax years at issue, 2009, 2010, 2011, and 2012, Plaintiff filed a consolidated return in accordance with ORS 317.710(5)(a). (Ptf's Mot at 1.) Plaintiff originally used the standard UDITPA[1] apportionment formula under ORS 314.665(4) and OAR 150-314.665(4)(2) and sourced its receipts from licensing and advertising outside of Oregon based on cost of performance. (*Id.*) Plaintiff's affiliated group included over 600 companies and Plaintiff applied the formula only to receipts of corporate members that it determined had nexus with Oregon.

---

[1] Uniform Division of Income for Tax Purposes, codified as ORS 314.605 to 314.675.

(Ptf's Mot at 11, Guzior Aff at ¶8.)  At audit, Defendant classified Plaintiff as an "interstate broadcaster" under ORS 314.680(3) and apportioned the income of Plaintiff's unitary group using ORS 314.680 to ORS 314.690 (the broadcaster statutes).  (Ptf's Mot, Guzior Aff, Ex 2 at 5-13.)  Plaintiff maintains that "only a small percentage of [its companies] were involved in any type of broadcasting activities."  (Ptf's Mot, Guzior Aff at ¶8; *see also* Ex 5 at 1 (identifying 10 such entities).[2])  At conference, Plaintiff raised the following issues: 1) whether Plaintiff and certain of its affiliates such as ESPN had nexus with Oregon, and 2) whether Plaintiff and its affiliates were interstate broadcasters.  (Ptf's Mot, Guzior Aff, Ex 7.)  The conference officer decided both issues in favor of Defendant.  (*See id.*)  Plaintiff disagrees and filed this appeal.

A.     *About Plaintiff*

Plaintiff is a diversified worldwide entertainment company with operations in five business segments: (1) Media Networks, (2) Parks and Resorts, (3) Studio Entertainment, (4) Consumer Products, and (5) Interactive Media.  (Ptf's Req Judicial Notice, Ex 1 at 5 (The Walt Disney Company's Form 10-K for the fiscal year ending October 3, 2009).[3])  Plaintiff reported the following business segment revenues (in millions) during the years at issue:

| Segment | 2009 | 2010 | 2011 | 2012 |
|---|---|---|---|---|
| Media Networks | $16,209 | $17,162 | $18,714 | $19,436 |
| Parks and Resorts | $10,667 | $10,761 | $11,797 | $12,920 |
| Studio Entertainment | $6,136 | $6,701 | $6,351 | $5,825 |
| Consumer Products | $2,425 | $2,678 | $3,049 | $3,252 |
| Interactive Media | $712 | $761 | $982 | $845 |
| Total | $36,149 | $38,063 | $40,893 | $42,278 |

(*Id.* at 35; Ex 4 at 34.)

---

[2] International Family Entertainment Group; ABC Cable Networks Group; American Broadcasting Cos Inc.; ESPN, Inc.; ESPN Classic; Cable LT Holdings; Disney/ABC International Television Inc.; BVTV Holdings, Inc.; Buena Vista Pay Television; Buena Vista Video on Demand.  (Ptf's Mot, Guzior Aff, Ex 5 at 1.)

[3] The facts set forth in this Statement of Facts pertain to the 2009 fiscal year unless otherwise noted.

1.    *Media networks*

"The Media Networks segment is comprised of a domestic broadcast television network, television production and distribution operations, domestic television stations, international and domestic cable networks, domestic broadcast radio networks and stations, and publishing and digital operations." (Ptf's Req Judicial Notice, Ex 1 at 5.) Plaintiff owns 10 television stations, none of which are in Oregon, and "has affiliation agreements with 233 local stations reaching 99 [percent] of all U.S. television households." (*Id.* at 5-6.[4]) It "produces and distributes live action and animated television programming under the ABC Studios, ABC Media Productions, and ABC Family Productions labels." (*Id.* at 5.)

> "The ABC Television Network derives substantially all of its revenues from the sale to advertisers of time in network programs for commercial announcements. The ability to sell time for commercial announcements and the rates received are primarily dependent on the size and nature of the audience that the network can deliver to the advertiser as well as overall advertiser demand for time on network broadcasts."

(*Id.*) Plaintiff's websites provide online access to full-length television episodes, news coverage, and video-on-demand. (*See id.*)

Plaintiff's two primary cable network brands are ESPN and Disney Channel, each of which also has radio operations. (Ptf's Req Judicial Notice Ex 1 at 6.) As of September 29, 2012, Plaintiff estimated it had 97 to 98 million subscribers each to ESPN, ESPN2, Disney Channel, ABC Family, A&E, Lifetime, and History. (*Id.*, Ex 4 at 5.) Plaintiff's cable networks "derive a majority of their revenues from fees charged to cable, satellite and telecommunications service providers (Multichannel Video Service Providers or MVSPs) and, for certain networks

---

[4] Federal regulations limit how many television and radio stations Plaintiff can own in a specific market area and the aggregate percentage of the national audience reached by Plaintiff's television stations. (*Id.*, Ex 1 at 11-12.)

(primarily ESPN and ABC Family), the sale to advertisers of time in network programs for commercial announcements." (*Id*., Ex 1 at 6.)

> "The amounts that [Plaintiff] can charge to MVSPs for [its] cable network services are largely dependent on competition and the quality and quantity of programming that [it] can provide. The ability to sell time for commercial announcements and the rates received are primarily dependent on the size and nature of the audience that the network can deliver to the advertiser as well as overall advertiser demand."

(*Id.*) "ESPN is a multimedia, multinational sports entertainment company that operates six domestic television sports networks" and "a network devoted to college sports." (*Id.* at 7.) It "programs the sports schedule on the ABC Television Network" and operates a website, a broadband service, a mobile service, a syndicator of college sports programs, a radio network, five radio stations, and more. (*Id.* at 7-8.) Sports programming is very competitive; Plaintiff "has sports rights agreements with the National Football League (NFL), college football (including college bowl games) and basketball conferences, National Basketball Association (NBA), National Association of Stock Car Auto Racing (NASCAR), Major League Baseball (MLB), World Cup and various soccer leagues, and Golf and Tennis Associations." (*Id.* at 11.)

Plaintiff's Disney Channel "is a 24-hour cable network with programming targeted to children and families through original series and movies. (Ptf's Req Judicial Notice Ex 1 at 8.) Many series produced for Disney Channel run on the ABC Television Network's Saturday morning program. (*See id.*) "Radio Disney is a 24/7 radio network for kids, tweens and families." (*Id.* at 10.) It is "available on 49 terrestrial radio stations," including one that Plaintiff owns in Oregon, and on other online, mobile, and satellite platforms. (*See id.*)

Plaintiff's "broadcast and cable networks compete for viewers primarily with other television and cable networks, independent television stations and other media, such as DVDs, video games and the internet." (Ptf's Req Judicial Notice, Ex 1 at 11.) Its "television and radio

stations primarily compete for viewers in individual market areas. A television or radio station in one market generally does not compete directly with stations in other markets." (*Id.*)

2. *Parks and resorts*

The Parks and Resorts segment owns and operates the Walt Disney World Resort in Florida, the Disneyland Resort in California, the Aulani Disney Resort and Spa in Hawaii,[5] the Disney Vacation Club, the Disney Cruise Line, and Adventures by Disney. (Ptf's Mot at 3; Ptf's Req Judicial Notice, Ex 1 at 13.) It designs and develops new theme parks and resorts. (*Id.*) This segment "generate[s] revenues predominately from the sale of admissions to the theme parks; room nights at the hotels; merchandise, food and beverage sales; sales and rentals of vacation club properties; and cruise vacation packages." (Ptf's Req Judicial Notice, Ex 1 at 13.) None of the entities in this segment hold FCC[6] broadcast licenses. (Ptf's Reply, Supp Guzior Aff at ¶3; *see also Id.*, Ex 2 (chart showing 20 entities that hold broadcast licenses).)

3. *Studio entertainment*

"The Studio Entertainment segment produces and acquires live-action and animated motion pictures, direct-to-video content, musical recordings, and live stage plays." (Ptf's Req Judicial Notice, Ex 1 at 17.) It derives income primarily from distribution of films "in the theatrical, home entertainment and television markets[,]" primarily under the Walt Disney Pictures, Pixar, and Marvel banners. (*Id.*; *see also* Ptf's Mot at 3.) Plaintiff's television distributors include Starz pay television service, the ABC Television Network, ABC Family, Disney Channel, and more. (Ptf's Req Judicial Notice, Ex 1 at 18.) None of the entities in this

---

[5] Plaintiff also "manages and has effective ownership interests of" several international properties. (Ptf's Req Judicial Notice, Ex 1 at 13.)

[6] The Federal Communications Commission (FCC) "regulates interstate and international communications by radio, television, wire, satellite and cable in all 50 states, the District of Columbia and U.S. territories.'" (Ptf's Reply at 4, citing Ex A (FCC webpage).)

segment hold FCC broadcast licenses. (Ptf's Reply, Supp Guzior Aff at ¶3; *see also* Ex 2 (chart showing 20 entities that hold broadcast licenses).)

4.      *Consumer products*

The Consumer Products segment designs, develops, publishes, promotes, and sells a wide variety of products based on existing and new Disney characters and other intellectual property through licensing, publishing, and retail businesses. (Ptf's Req Judicial Notice, Ex 1 at 20.) It also develops new intellectual property to be used in Plaintiff's other businesses. (*Id.*)

5.      *Interactive media group*

The Interactive Media Group "creates and delivers Disney-branded entertainment and lifestyle content across interactive media platforms." (Ptf's Req Judicial Notice, Ex 1 at 20.) Its primary operations are producing video games, web sites, and "online virtual worlds." (*Id.*) This segment "derives revenues from a combination of wholesale sales, licensing, advertising, sponsorships, subscription services and online game accessories." (Ptf's Mot at 4.)

B.      *Plaintiff's Contracts with Third Part Affiliates and MVS*

ABC, Inc. had an affiliation agreement with Fisher Broadcasting-Portland TV, LLC, for program carriage and promotion on the station KATU-TV. (Harbur Decl, Ex B.) The agreement granted Fisher the right to broadcast copyrighted network television programs and to use ABC trademarks. (*Id.* at 1.) ABC, Inc., had a similar agreement with Chambers Communication Corp, KXYZ-TV Bend. (Harbur Decl, Ex C.)

ESPN, Inc. licensed programming content to third parties including Comcast. (Ptf's Reply, Ex E at 1, *see also* Ptf's Reply at 12-14.) ESPN's agreement with Comcast is representative of its agreements with other licensees. (Ptf's Mot, Guzior Aff, Ex 4 at 2 (Ptf's Ltr to Def summarizing key parts of Comcast contract).) ESPN transmitted its content by satellite to

Comcast. (*See* Ex E at 11-12.) Comcast then downloaded the content from ESPN and packaged it with programming licensed from other companies for distribution to its subscribers. (*See* Ptf's Mot, Guzior Aff, Ex 4 at 3.) ESPN retained



(Ptf's Reply, Ex E at 5.) ESPN was free to change its programming in certain localities or markets, provided it treated all other affiliates the same. (*Id.*) ████████████████████████

████████████████████████████████████████████████████

████████████████████████████████ (*Id.* at 15-16.) References to "subscribers" in the Comcast agreement are to Comcast's subscribers who have purchased a package including ESPN. (*See id.*) The agreement provides that neither party was the other's agent. (*See id.* at 27.) The agreement disclaimed any privity of contract between ESPN and Comcast's subscribers. (*Id.*)

ESPN had a distribution agreement with EchoStar Satellite LLC, a Colorado LLC. (Harbur Decl, Ex A.) Under the agreement, ESPN retained similar content control as under its Comcast agreement and granted EchoStar the right to use ESPN's marks for promotion and in its guides. (*See id.*) ████████████████████████████████

████████████████████████████████████ (*Id.* at 16-17.)

C.      *Plaintiff's Regulatory Filings in Oregon*

ABC, Inc. registered with the Oregon Secretary of State in 1981 and filed annual reports in the tax years at issue. (Harbur Decl, Exs D-H.) It listed its "business activity" as "television and radio broadcasting." (*See id.*) ESPN Regional Television, Inc. registered in 1999 and filed

reports during the years at issue. (Ex I.) Mobile ESPN, LLC registered in 2005. (Ex J.) ESPN

Events and ESPN Productions, Inc. each registered in 2016. (*See* Exs K, L.)

## II. STATEMENT OF ISSUES AND STANDARD FOR SUMMARY JUDGMENT

The parties have presented three issues for summary judgment:

1) Whether the interstate broadcaster apportionment formula applies to all members of a consolidated group or only those members that engage in broadcasting;

2) Whether Plaintiff is an "interstate broadcaster" under ORS 314.680(3)[7]; and

3) Whether Plaintiff has substantial nexus with Oregon.

(Ptf's Mot at 2; Def's Resp and MSJ at 1-2, 5.) The court shall grant summary judgment "if the

pleadings, depositions, affidavits, declarations, and admissions on file show that there is no

genuine issue as to any material fact and that the moving party is entitled to prevail as a matter of

law." Tax Court Rule 47 C. Plaintiff is the moving party with respect to the first issue.

Defendant is the moving party with respect to the second and third issues. Plaintiff argues that

Defendant's cross-motion should be denied both because there are issues of material fact and

because it "is wrong as a matter of law." (Ptf's Reply at 9.)

In all proceedings before this court, the party seeking affirmative relief shall bear the

burden of proof by a preponderance of the evidence. ORS 305.427. A "[p]reponderance of the

evidence means the greater weight of evidence, the more convincing evidence." *Feves v. Dept.*

*of Revenue*, 4 OTR 302, 312 (1971). "A party opposing summary judgment cannot rest upon the

allegations of [its] pleadings[, but] must 'disclose the merits of [its] case or defense." *Eugene*

*Television, Inc. v. Flinn,* 43 Or App 837, 841, 604 P2d 437 (1979).

/ / /

---

[7] The court's references to the Oregon Revised Statutes (ORS) are to 2007. The statutes cited in this order were not amended in 2009 or 2011, which apply to the 2010 through 2012 years.

III.    ANALYSIS

A.    *Interstate Broadcaster Apportionment Generally*

ORS 314.680 to 314.690 (the broadcaster statutes) prescribe a special sales factor[8] for the apportionment of income of "interstate broadcasters" that is distinct from the sales factor under UDITPA, ORS 314.605 to 314.665.  *See also Comcast Corp. v. Dept. of Rev.*, 363 Or 537, 539-540, 423 P3d 706 (2018) (discussing creation of the broadcaster statutes in 1989).  To apportion sales to Oregon, the sales factor numerator for an interstate broadcaster includes "all gross receipts attributable to this state" as well as "gross receipts from broadcasting" multiplied by the ratio of its Oregon audience or subscribers over its total audience or subscribers.  ORS 314.684(3)-(4).

The phrase "gross receipts from broadcasting" is defined as "all gross receipts of an interstate broadcaster from transactions and activities in the regular course of its trade or business except receipts from sales of real or tangible personal property."  ORS 314.680(2).  In *Comcast*, the taxpayer argued that "gross receipts from broadcasting" should include only receipts from its activity that qualifies as broadcasting.  363 Or at 541.  The taxpayer derived revenue "from the provision of cable television, internet and voice over internet protocol services to subscribers in Oregon and other states."  *Comcast*, 22 OTR 295, 296 (2016), *aff'd* 363 Or 537.  The taxpayer did not dispute that it engaged in "broadcasting" but contended "that most of its receipts for the disputed tax years arose from activity that does not qualify as 'broadcasting[.]' "  *Comcast*, 363 Or at 541.  The Court disagreed, holding that "gross receipts from broadcasting" included "'all

/ / /

___

[8] During the tax years at issue, Oregon used only the sales factor to apportion business income to this state. *See* ORS 314.650.

gross receipts of [the broadcaster] from transactions and activities in the regular course of its trade or business'–not solely receipts from 'broadcasting' activities." *Id.* at 551.

B.      *Whether the Interstate Broadcaster Apportionment Formula Applies to All Members of a Consolidated Group or Only Those Members that Engage in Broadcasting*

Notwithstanding the ruling in *Comcast*, Plaintiff argues that the special sales factor for interstate broadcasters should apply only to those corporations within a consolidated return group that engage in broadcasting. (*See* Ptf's Mot at 2, 12, 14.) The receipts of other, non-broadcaster members of the group are subject to apportionment under UDITPA. (*See id.*) Rather than focusing on revenue streams as the taxpayer did in *Comcast*, Plaintiff asks the court to examine the activities of each entity within the consolidated return group to determine if it is engaged in interstate broadcasting and to source its receipts accordingly. (*See* Ptf's Reply at 2, 5.) For example, Plaintiff observes that the corporations composing its Parks and Resorts segment are clearly not broadcasters. (Ptf's Mot at 12; *see also* Ptf's Reply at 4 (noting that none of the corporations in the Parks and Resorts segment are licensed by the FCC).)

Plaintiff makes two arguments in support of its position. First, the text of the broadcaster statutes and accompanying rules refer to *a taxpayer* and *an interstate broadcaster*, each in the singular, suggesting that they apply to individual corporations rather than consolidated groups. (Ptf's Mot at 1-2, 4, 10, 13.) Furthermore, the term "taxpayer" under Oregon law "is defined consistently with federal law and is considered to be an individual corporation, not an affiliated or consolidated group of corporations." (*Id.* at 13.) Second, "for apportionment purposes," ORS 317.715(3)(b) requires each corporation in an affiliated group to be "treated separately, notwithstanding the fact the affiliated group may be conducting a unitary business." (*Id.* at 14.)

With respect to Plaintiff's first argument concerning the text of the broadcaster statutes, Defendant notes the term "business" in "interstate broadcaster business." (Def's Reply at 5-6,

citing ORS 314.680(3).) "Business" is used without regard to the particular corporate organizational structure and must be understood in the context of consolidated reporting of unitary business income in which intercompany transactions are eliminated. (*Id.* at 6.) With respect to Plaintiff's second argument, Defendant responds that ORS 317.715(3)(b) does not, by its terms, apply to interstate broadcasters. (Def's Resp and MSJ at 5-6 (noting that the statute ends with the language "under ORS 314.280 or 314.605 to 314.675" and makes no reference to ORS 314.680 to 314.690).) Even if ORS 317.715(3)(b) applies, its only function is to say that "each corporation will be looked at to see whether it is doing business in Oregon and therefore is subject to Oregon's taxing jurisdiction, and only if such a corporation has receipts from doing business in Oregon will the receipts be apportioned to Oregon." (*Id.* at 7.) It is a "return-filing requirement" and not an "apportionment rule." (*Id.* at 7, n7.)

1.      *Proper construction of the broadcaster statutes*

The first step of statutory construction is "an examination of text and context." *State v. Gaines*, 346 Or 160, 171, 206 P3d 1042 (2009) (citing *PGE v. Bureau of Labor and Industries*, 317 Or 606, 610-11, 859 P2d 1143 (1993)). The court begins with the text because "there is no more persuasive evidence of the intent of the legislature than the words by which the legislature undertook to give expression to its wishes." *Gaines*, 346 Or at 171 (internal quotation marks omitted). The court gives "words of common usage * * * their plain, natural, and ordinary meaning." *PGE*, 317 Or at 611. "Statutory context includes other provisions of the same statute and other related statutes, as well as the preexisting common law and the statutory framework within which the statute was enacted." *Con-Way, Inc. & Affiliates v. Dept. of Rev.*, 353 Or 616, 620, 302 P3d 804 (2013) (internal quotation marks removed). "Legislative history may be used to confirm seemingly plain meaning and even to illuminate it; a party also may use legislative

history to attempt to convince a court that superficially clear language actually is not so plain at all—that is, that there is a kind of latent ambiguity in the statute." *Tektronix, Inc. v. Dept. of Rev.*, 354 Or 531, 544, 316 P3d 276 (2013) (internal quotation marks removed).

2.    *Text*

Plaintiff argues that the use of singular terms "a taxpayer" and "an interstate broadcaster" in the broadcaster statutes supports its position that each entity within a consolidated reporting group must be considered separately to determine if it is subject to the broadcaster apportionment formula. Defendant reads those terms expansively as including a unitary group composed of multiple corporations that engage in the for-profit business of broadcasting.[9] As used in Oregon statutes, "[t]he singular number may include the plural and the plural number, the singular." ORS 174.127(1); *see also School Dist No 1 v. Mult Co*, 9 OTR 371, 377 (1983) (applying that statute to support reading a singular term, "corporation," to be plural in context); *see also Landsem Farms, LP v. Marion County*, 190 Or App 120, 127-128 (2003) (construing the term "gathering" in the singular based on the context). The fact that the statutes use singular terms does not end the inquiry; the court must consider the terms in context.

3.    *Context*

Relevant context includes the unitary business rule and combined reporting under Oregon law. *See generally* ORS 317.705 to 317.715 (defining "unitary business," generally requiring a consolidated state return by affiliated groups filing federal consolidated returns that are engaged

---

[9] Consistent with Defendant's position, in the *Comcast* cases, the Regular Division of this court and the Oregon Supreme Court each referred to the plaintiff as "the taxpayer" notwithstanding that the plaintiff was "Comcast Corporation and Subsidiaries." Plaintiff here asserted that the taxpayer in *Comcast* was "a single legal entity" but offered no support for that assertion. (Ptf's Reply at 5.) In the Magistrate Division case, the court discussed the plaintiff's "consolidated revenues," presumably referring to revenue reported on a consolidated return. *Comcast Corp. v. Dept. of Rev.,* TC-MD 140214C, 2014 WL 7150431 at *2 (Or Tax M Div Dec 10, 2014), *rev'd on other grounds* 22 OTR 295.

in a unitary business).[10]  As the Oregon Supreme Court has explained,

> "the purpose of the combined report is to insure that the income of a business conducted partly within and partly without the taxing state shall be determined and apportioned in the same manner regardless of whether the business is conducted by one corporation or by two or more affiliated corporations.  In cases where the business is conducted by one corporation, the income is computed as a unit and apportioned by means of an appropriate formula * * *.

> "When the combined report is employed, exactly the same procedure is followed, and the same results obtained, in cases where the business is conducted by more than one corporation.  The income is still computed as a unit just as it would be if the business had been conducted by one corporation only."

*Coca Cola v. Dept. of Rev.*, 271 Or 517, 526, 533 P2d 788 (1975), quoting Keesling, *A Current Look at the Combined Report and Uniformity in Allocation Practices*, 42 J Taxation 106 (Feb 1975) (internal quotation marks omitted).  In approving the combined reporting method for unitary businesses, the court found the statutory reference to "taxpayer in the singular" was "no bar[,]" noting "that the prior statute also spoke in the singular" yet the court approved combined reporting.  *Id.* at 527-28,[11] (citing *Zale-Salem, Inc. v. State Tax Comm'n*, 237 Or 261, 391 P2d 601 (1964)).  A business should not "stand in a better position for purposes of determining income merely because it chooses to use a multiple corporation organizational scheme."  *Id.*

Plaintiff argues that ORS 317.715(3)(b) supports a reading of "taxpayer" and "interstate broadcaster" in the singular, whereas Defendant maintains that – if the statute even applies to

---

[10] Although Oregon law refers to a unitary group filing a "consolidated" state return, it is "effectively[] a combined report."  *See Cook v. Dept. of Rev.*, TC 5298, WL 3956126 at *10 (Or Tax Aug 17, 2018); *see also* Hellerstein & Hellerstein, *State Taxation*, §8.11(3), fn 1203 (3d Ed Sept 2019) (stating that Oregon "essentially provides for combined reporting (that reflects constitutional restraints on apportionability of income * * *) by limiting the affiliated group to affiliates engaged in a unitary business * * * and providing for appropriate modifications of the apportionable base and the formula to reflect the exclusion of nonunitary affiliates."  The federal consolidated return is the starting point for determining Oregon taxable income.  ORS 317.715(1).  If a federal consolidated return group includes more than one unitary group, they must be separated before Oregon modifications and apportionment.  ORS 317.715(2), (3)(a).

[11] The court interpreted ORS 314.615, which, "for the tax years 1965 and 1966 * * * required a taxpayer having business which is taxable both within and without the state to use the apportionment method."  *Id*. at 522.

interstate broadcasters – it serves only to exclude from the numerator corporations that lack nexus with Oregon. (*See* Def's Reply at 5-6.)

ORS 317.715(3)(b) states in relevant part that

"members of an affiliated group making * * * a consolidated state return shall not be treated as one taxpayer for purposes of determining whether any member of the group is taxable in the state * * * with respect to questions of jurisdiction to tax or the composition of the apportionment factors used to attribute income to this state under ORS 314.280 or 314.605 to 314.675."

In Plaintiff's view, "the composition of the apportionment factors used to attribute income to this state" means that the sales factor applicable to each corporate entity must be determined separately and without regard to any other entity. For instance, viewed individually the corporations within Plaintiff's Parks and Resorts segment are not broadcasters, so the broadcaster apportionment formula should not apply to companies in that segment. Defendant disagrees, arguing that a company-by-company determination of the sales factor ignores the definition and significance of the unitary group.[12] (Def's Reply at 5-6.)

Plaintiff's reading of ORS 317.715(3)(b) is contrary to the apportionment of business income of a unitary group filing a consolidated Oregon return.

"Apportionment is the process by which a 'base' of business income is divided among two or more states. * * * A fundamental first step in this analysis is that apportionment can be applied to a base of business income of one entity operating in several states or a related group of entities operating in several states. However, apportionment of the income of a group of entities occurs when a state has adopted combination rules in some form. In both cases--either one entity or a group of entities--it is said that *what is being apportioned is the income of a 'unitary' operation.*"

---

[12] Defendant argues that Plaintiff's theme park and resort receipts are related to its broadcasting activity, noting that the "themes" in theme parks pertain to movies and television shows broadcast to viewers, "creating a synergistic flow of value that is the essence of the unitary business reporting in the consolidated return." (Def's Reply at 8-9.) Defendant further asserts that removal of those receipts "would only slightly decrease their broadcaster assessment." (*See* Def's Resp and Motion for Summary Judgment at 9; *see also* Decl of James Carter at ¶5.) Plaintiff disagrees with Defendant's calculations and performed its own. (Ptf's Reply, Supp Guzior Aff at ¶¶ 4-5.)

*Cook v. Dept. of Rev.*, TC 5298, WL 3956126 at *4 (Aug 17, 2018) (emphasis added); *see also*

*Crystal Communications, Inc. v. Dept. of Rev.*, 353 Or 300, 303, 297 P3d 1256 (2013) ("The

apportionment method * * * generally has been understood to apply to unitary businesses * * *")

(citation omitted); *see also US Bancorp v. Dept. of Rev.*, 13 OTR 84, 88 (1994) ("the dominant

business activities of the unitary group are banking and financial services. Therefore, the

apportionment of [the unitary group's] income is governed by [the financial institution

formula]").

     Although *Comcast* did not address Plaintiff's precise argument, the Regular Division of

this court "rejected [a] hybrid approach to apportionment" whereby receipts from activities other

than broadcasting were sourced under UDITPA. 363 Or at 541-42. In dicta, the court noted that

a taxpayer may "show that it engaged in multiple trades or businesses, only one of which was

interstate broadcasting." 22 OTR at 299, n6. Defendant indicated that it might apply "two or

more apportionment regimes" in that case, "with the Broadcaster Statutes only applying to the

separate interstate broadcaster business." *Id.* The court understands that dicta to contemplate a

taxpayer with multiple businesses that are not unitary, which is not the case here.

     The function of ORS 317.715(3)(b) is, as Defendant said, to exclude from the numerator

of the apportionment formula the income of corporations that lack nexus with Oregon. That is

"the teaching of 317.715(3)(b)" – that a corporation may not "be included in the numerator of the

relevant apportionment formula" merely because it is the parent of a taxpayer doing business in

Oregon and they are members of the same unitary group. *Ann Sacks Tile & Stone v. Dept. of

Rev.*, 20 OTR 377, 379-380 (2011). The example provided in the rule confirms that reading:

> "Corporations A, B and C are members of the same unitary group and file a
> consolidated federal return. Corporation C is 'doing business' in Oregon as
> defined under ORS 317.010(4) while Corporations A and B have no activities in
> Oregon. Since Corporation C is the only member of the affiliated group subject

to the tax jurisdiction of Oregon, the Oregon amounts included in the numerator
of the apportionment formula are determined by applying the provisions of
314.605 to 314.667 to the business activities of Corporation C.  The denominator
of the apportionment formula will include the everywhere amounts for
Corporations A, B and C as determined by applying the provisions of 314.655 to
314.667."

OAR 150-317-0630; *see also Estee Lauder Services Inc. v. Dept. of Rev.*, 16 OTR-MD 279, 284-85 (1999) (explaining the operation of ORS 317.715(3)(b) and providing a similar example).[13]

A unitary business enterprise is characterized by "a sharing or exchange of value" between the members.  ORS 317.705(3).  A unitary business composed of multiple corporations is necessarily part of an affiliated group in which a parent controls the subsidiaries through stock ownership.  Here, there is no dispute that Plaintiff is a unitary group.  Thus, the base of income to be apportioned represents the business activity of the unitary group, not individual corporations depending on whether each meets the definition of broadcaster.

4.      *Legislative history*

i.      1989 passage of broadcaster statutes

Defendant offered legislative history from the 1989 passage of the broadcaster statutes to assist the court's construction of those statutes.  (Def's Resp and Motion for Summary Judgment, Ex A.)  None of the legislative history specifically discusses the significance of the singular terms *a taxpayer* or *an interstate broadcaster*.  (*See id.*)  However, in a public hearing held June

---

[13] *See also Joyce v. Finnigan: Adoption of the "Best" Approach in Hopes of Some Uniformity*, Lisandra Ortiz, 67 Tax Law 979 (Summer 2014) (Def's Ex M).  "The *Joyce-Finnigan* issue arises when formulary apportionment is permitted and a unitary business must be present before formulary apportionment can be required." (Def's Ex M at 7.)  For example, where two corporations X and Y operate as a unit but only one is taxable in the sale destination state, "the taxpayer" must be identified to determine whether the throwback rule applies.  (*Id.* at 10.) "If only Corporation X is the taxpayer, then the sales to State B must be thrown back to State A (origin state) because Corporation X is not taxable in the destination state, resulting in the problem of nowhere income.  However, if both corporations are viewed as a unit (i.e., as one taxpayer), then the throwback rule should not apply because Corporation Y is taxable in State B.  In a nutshell, the former is the approach taken in *Joyce*, and the latter is the approach taken in *Finnigan*."  (*Id.* at 10-11.)  Oregon is a *Joyce* state based on ORS 317.715(3)(b).

12, 1989, Richard Yates of the Legislative Revenue explained to the Senate Committee on

Revenue and School Finance:

> "Whenever you are dealing with Oregon and a multistate situation, you have to first decide what the unitary group is. And you find a group of businesses which are functioning essentially as a unit, alright? Now, we've been circumscribed a little bit, we can't go worldwide any more, we can only go water's edge, okay? We define the unitary group somehow which operates and then you look at the total receipts for that group and you look at all the total audience in this case for a broadcaster, whatever that group was, Seattle stations or Salt Lake City stations or some Oregon station. You look at that total audience relative to the Oregon audience but then you apply that factor to the total income of that unitary group. Not just the operations in Oregon."

(*Id.* at 43, 53.) That testimony supports Defendant's view that the legislature intended the

broadcaster statutes to apply to a unitary group, which may include multiple corporations.

Throughout the legislative hearings, the new broadcaster statutes were compared to

apportionment under UDITPA. (*See* Def's Resp and MSJ, Ex A at 8, 19, 24, 44-45, 47.)

Witnesses and committee members recognized that the broadcaster statutes depart[ed] from the

cost of performance rule under UDITPA and replaced it with a "viewing audience" formula. (*Id.*

at 8 (statement of Jim Gardner, Oregon Association of Broadcasters), 47 (testimony of Jim

Brown, Department of Revenue).)[14] The legislative history supports a reading of the broadcaster

statutes as distinct from UDITPA, undercutting Plaintiff's contention that both apportionment

schemes apply within the context of a single consolidated return.

/ / /

---

[14] An early draft of the bill defined "gross receipts from broadcasting" as limited to "receipts from advertising attributable to broadcasting" rather than "all broadcasting receipts." (*Id.* at 18-19 (testimony of Elizabeth Stockdale, Department of Justice).) Stockdale observed the draft bill stood "half way" independent of UDITPA and "half way" attempted to modify UDITPA. (*See id.*) She suggested that "[i]t needs to be structurally either within or outside [UDITPA] as a whole." (*Id.*) In response to those concerns, the committee convened a work group that "put [the audience factor allocation formula] in a separate apportionment scheme similar to that which we have for financial institutions and for utilities" rather than placing it in UDITPA. (*Id.* at 24.) That version of the bill ultimately passed.

ii.     2020 proposed amendments to broadcaster statutes

Plaintiff's Post-Argument Motion to Supplement the Record (Ptf's Mot to Supp), was filed on March 9, 2020, requesting that the court consider testimony that Defendant's counsel, Harbur, made before the legislature. Defendant filed its Response on March 18, 2020, submitting a corrected transcript of that hearing and urging the court to deny the motion, arguing that Harbur's testimony was not relevant to the tax years at issue. Plaintiff's filed its Reply on March 31, 2020.

The testimony at issue was made by Harbur on February 4, 2020, before the Senate Committee on Finance and Revenue regarding SB 1529 (2020). SB 1529 was a bill proposing a change in the broadcaster apportionment statutes from "commercial domicile sourcing"— applicable to the 2014 through 2019 tax years – to "market-based sourcing" or some other apportionment formula. Staff Measure Summary, Senate Committee on Finance and Revenue, SB 1529 -8 (2020).[15] The existing formula was slated to sunset in 2020 resulting in the revival of the audience factor apportionment at issue in this case. SB 1529 (2020).

Plaintiff alleges that Harbur "testified that under the special apportionment formula for interstate broadcasters, no receipts would be included in the numerator of the sales factor for theme parks" in the same unitary group as an interstate broadcaster.[16] (Ptf's Mot to Supp at 2.)

---

[15] https://olis.leg.state.or.us/liz/2020R1/Downloads/CommitteeMeetingDocument/217952

[16] In response to a question from Chair Haas regarding the fairness of including theme parks and other out-of-state non-broadcasting activity in the calculation Harbur responded:

"Well, there are two things to think about. The theme parks are themes because they are themes of the motion pictures and the TV shows that these customers are broadcasting. So, it's very integrally, it's an integral part of the unitary business, and it's no different than any other business that you can think of. I don't know * * * Boeing, to use a totally different example, may have buildings or plants in different areas, but they still do business in the state of Oregon. And it's the integrated operation of that business that produces the unitary business income. And so the question is what percentage should be assigned to Oregon, and if you look at how many airplane parts are sold here, then that is a way to measure Oregon's percentage of that total unitary business income. So, in taking it back to Netflix, you want to know what percentage of the subscriber activity Netflix has throughout the entire country should be assigned here. And if they happen to be a company with theme parks, then that is just part of

Plaintiff states that "[t]his testimony directly contradicts Defendant's position in this case." (*Id.*) Defendant objects "to supplementing the 'record' with irrelevant, mischaracterized and incorrectly transcribed legislative hearing testimony * * *." (Def's Resp at 1.) Defendant asserts that the discussion was focused on the difference between the existing "commercial domicile sourcing" and the proposed "market-based sourcing" approach and did not relate the audience factor apportionment at issue in this case. (*Id.* at 2-3.) Plaintiff states that Harbur's "testimony, whether it is in the context of market-based sourcing or the special formula for interstate broadcasters, acknowledges that it would be unfair * * * to include those receipts in the numerator of the sales factor." (Ptf's Reply at 3.)

Generally, "[s]ubsequent statements by legislators are not probative of the intent of statutes already in effect." *United Tel. Employees Pac v. Secretary of State*, 138 Or App 135, 139, 906 P2d 306 (1995); *see also Salem-Keizer Ass'n of Classified Employees. v. Salem-Keizer Sch. Dist. 24J*, 186 Or App 19, 27, 61 P3d 970 (2003) (court was "loath to determine the intentions of the institution as a whole on the basis of isolated statements that are generated after enactment, without any evidence that the other members of the legislative body even were aware of them, much less that they agreed with them."). The court finds that the legislative committee discussion concerning the 2020 bill, including Harbur's testimony, should be given little weight because it is not contemporaneous with the statutes at issue. The court's task is to discern the legislature's intent in enacting the broadcaster statutes in 1989.

5.     *Conclusion*

Upon consideration, the court concludes that the broadcaster statutes may be applied to the receipts of a unitary group filing a consolidated return. They are not limited in application to

their unitary business income. There won't be anything in the numerator for it because that's not part of the measurement. But it is still a part of the unitary business income." (Def's Resp, Ex D at 7.)

a single corporation. Moreover, the legislature and courts have rejected a hybrid approach, whereby the broadcaster statutes and UDITPA are separately applied to various categories of receipts. Accordingly, Plaintiff's Motion for Partial Summary Judgment is denied.

C.      *Whether Plaintiff is an Interstate Broadcaster*

"Interstate broadcaster" is defined as "a taxpayer that engages in the for-profit business of broadcasting to subscribers or to an audience located both within and without this state." ORS 314.680(3). "Broadcasting" is defined as "the activity of transmitting any one-way electronic signal by radio waves, microwaves, wires, coaxial cables, wave guides or other conduits of communications." ORS 314.680(1). "The consequence of a taxpayer engaging in any interstate broadcasting is that the numerator of the sales factor for that taxpayer includes 'all gross receipts attributable to this state, with gross receipts from broadcasting to be included as specified in subsection (4) of [ORS 314.684].' " *Comcast*, 22 OTR at 297 (2016) (emphasis removed from original). In reaching that determination, the court rejected taxpayer's argument "that only a portion of its revenues arise from transmission of one-way electronic signals." *Id.* at 298. The court explained "[t]hat is not what the Oregon statutes allow or require. A taxpayer is an interstate broadcaster if it engages in one-way transmission of electronic signals. Without a clear indication of legislative intent, the court cannot accept taxpayer's invitation to read the words 'only if' or 'only to the extent that' into the statutory scheme." *Id.* at 298.[17]

Defendant asks the court to find that Plaintiff is an "interstate broadcaster business" based on its 10-Ks and legislative history from the 1989 passage of the broadcaster statutes reflecting that "NBC, ABC and CBS were thought of as the three national broadcasters." (Def's

---

[17] Comcast did not challenge that finding on appeal. 363 Or at 541 n5 ("The Tax Court concluded that taxpayer meets the definition of an 'interstate broadcaster' because 'it engages in some' activity that is 'broadcasting.' Taxpayer does not challenge that determination on appeal." (internal citation omitted)).

Resp and MSJ at 5.) Plaintiff disagrees that it was an interstate broadcaster and disputes that the meaning of "broadcasting" in its 10-Ks is the same as the meaning of that term for purposes of the broadcasting statutes. (Ptf's Reply at 10, n23.) Plaintiff argues that ESPN cannot be a broadcaster because it lacks nexus with Oregon and is not, therefore, a "taxpayer." (*Id.* at 15.) Although Plaintiff asserted that material facts were in dispute, it failed to identify any such facts.

Plaintiff clearly engages in interstate broadcasting. Its Media Networks segment – which generated the largest portion of Plaintiff's revenues in the years at issue – was "comprised of a domestic broadcast television network, television production and distribution operations, domestic television stations, international and domestic cable networks, [and] domestic broadcast radio networks and stations[.]" (Ptf's Req Judicial Notice, Ex 1 at 5.) Plaintiff derived significant revenue from advertising, particularly for its ESPN and ABC Family networks. The amount of advertising revenue Plaintiff receives depends primarily on the size and nature of its audience, as contemplated by the broadcaster statutes.

It is evident from the 1989 legislative history of the broadcaster statutes that the legislature considered "the national networks" such as "NBC" to be interstate broadcasters but they did not think those networks had nexus with Oregon under the law at that time. In discussing the revenue impact of the broadcaster statutes, Chair Hosticka inquired about "nexus with any networks" to which Jim Scherzinger of the legislative finance office replied: "It does add a potential in the future if nexus is established with national broadcasters that it could raise money for the State. And that's a legal issue that is not the current treatment." (Def's Resp and MSJ, Ex A at 30.) Senator McCoy asked, "How would the tax work say on NBC?" (*Id.* at 44.) Jim Gardner from the Oregon Association of Broadcasters responded:

> "Okay, let's assume NBC has a taxable nexus in the State of Oregon. It has a sales office or, or a crew presence or whatever it would take to create taxable

nexus for a particular year. What you would do is that you would determine for that taxable year NBC's total income, and then you would apportion a fraction of it to Oregon and you would use * * * their audience in Oregon as a fraction of their audience nationally. And the difference between the way it's currently done is that use of the audience. Right now Oregon would use the cost of performance as the sole basis for apportioning sales. And the cost of performance is typically going to be, almost entirely in New York, LA, somewhere like that. So, this, this gives from the national broadcaster perspective, it gives Oregon what I think is widely viewed as a fairer way of apportioning sales."

(*Id.* at 44-45.)

Based on Plaintiff's interstate broadcasting activities reported in its 10-Ks and the clear intent of the legislature that national broadcasters met the definition of interstate broadcasters, the court finds that Plaintiff was an "interstate broadcaster" under ORS 314.680(3).

D.      *Substantial Nexus*

Defendant asks the court to find that Plaintiff had substantial nexus with Oregon under OAR 150-317-0020[18] and that it was "doing business" in Oregon under OAR 150-317-0030. (Def's Resp and MSJ at 2-3.) Plaintiff disagrees, arguing both that genuine issues of material fact exist, and that Defendant is wrong as a matter of law. (Ptf's Reply at 9.) It appears that the parties approach this question differently. Defendant focuses generally on Plaintiff's unitary business,[19] whereas Plaintiff concedes that some members of its group are doing business in Oregon and are subject to tax in this state, but maintains that ESPN[20], for example, does not have substantial nexus with Oregon. The different approaches may stem from a disagreement whether

---

[18] *Formerly* OAR 150-317.010 (2009).

[19] Defendant argues that Plaintiff profits from audiences viewing its licensed programming in Oregon, as evidenced by its extensive reach: several of its cable networks reach 97 to 98 million viewers and its ABC broadcast programming reaches 99 percent of all U.S. television households. (Def's Resp and MSJ at 3-4.) Plaintiff receives significant income from sales of time for commercial announcements, which depends on the size and nature of the audience that Plaintiff can deliver. (*Id.* at 4.)

[20] ESPN, Inc., ESPN Classic, and ESPN enterprises (collectively, ESPN). (Ptf's Reply at 10, n24.)

ORS 317.715(3)(b) – the *Joyce* rule – applies to broadcasters.  (*See* Ptf's Reply at 15.)  The court begins with that statute before looking at nexus.

### 1. *ORS 317.715(3)(b), the "Joyce rule"*

As discussed above, ORS 317.715(3)(b) states in relevant part that

> "members of an affiliated group making * * * a consolidated state return shall not be treated as one taxpayer for purposes of determining whether any member of the group is taxable in the state * * * with respect to questions of jurisdiction to tax or the composition of the apportionment factors used to attribute income to this state under ORS 314.280 or 314.605 to 314.675."

The function of ORS 317.715(3)(b) is to exclude from the numerator of the apportionment formula the income of corporations that lack nexus with Oregon.[21]  Defendant argues that ORS 317.715(3)(b) does not, by its terms, apply to interstate broadcasters because the statute does not reference the broadcaster statutes, ORS 314.680 to 314.690.  (*See* Def's Reply at 7-8.)  At oral argument, Plaintiff offered a possible explanation for the omission: ORS 317.715 was enacted in 1984 – five years before the broadcaster statutes.

The court considers context and legislative history in addition to the plain text of the statute.  ORS 314.690 states that the provisions of the broadcaster statutes "are not intended to change the meaning of the terms 'income-producing activity,' 'sources within this state,' 'business activity' taxable in this state or 'doing business' in this state contained in this chapter or ORS chapter 317 or 318."  The legislative history confirms that the legislature did not intend "to change the definition of nexus under the various provisions of chapter 314, 317 and 318, the doing business sections."  (Def's Resp and MSJ, Ex A at 4 (statement of Gardner).[22])  The

---

[21] *See also* OAR 150-317-0630(1), stating "Each member of an affiliated group of corporations must be treated as a separate corporation for purposes of determining whether it is subject to the tax jurisdiction of Oregon. A corporation is subject to the tax jurisdiction of Oregon if it is 'doing business' in Oregon as defined under ORS 317.010(4) or has income from Oregon sources taxable under 318.020."

[22] The legislature also expected the concept of nexus to change over time and intended those changes to apply to interstate broadcasters as with other taxpayers.  Gardner stated "the intent of the bill is not to change

legislature specifically contemplated that unitary groups, as defined in ORS 317.705 to 317.725, engaged in broadcasting would apportion income to Oregon using the special formula for broadcasters. (*See id.* at 53, (statement of Yates).) The context and legislative history support the conclusion that ORS 317.715(3)(b) applies to interstate broadcasters.

2. *Substantial nexus generally*

Oregon "impose[s] on each corporation doing business within this state an excise tax for the privilege of carrying on or doing that business measured by its federal taxable income as adjusted in this chapter." ORS 317.018(3). Oregon has "extended the reach of the excise tax to the limit defined by the federal constitution." *Ann Sacks Tile and Stone, Inc. v. Dept. of Rev.*, 20 OTR 377, 381 (2011); *see also* OAR 150-317-0020(1). "Oregon's corporate income tax is also a tax measured by or according to net income. Subject to certain exemptions, it is imposed on corporations that have 'Oregon taxable income derived from *sources* within this state.'" *Capital One Auto Finance Inc. v. Dept. of Rev.*, 22 OTR 326, 331 (2016), citing ORS 318.020(1) (emphasis in original), *aff'd* 363 Or 441. It, too, reaches to the federal constitutional limit. *Id.* at 333. "Despite being contained in separate chapters, the corporate excise and corporate income tax regimes were intended to operate as one cohesive tax regime. * * * Indeed, the corporate income tax only reaches to income not already subject to the corporate excise tax, and it taxes such income at the same tax rate." *Id.* at 332.[23]

---

anyway shape or form the current definition of nexus as it exists in the statutes so that as the language evolves through traditional interpretation you will be able to avail yourself of that evolution." (Def's Resp and MSJ, Ex A at 13.)

[23] For a more detailed discussion and history of the corporate excise tax and income tax, *see Capital One Auto Finance Inc. v. Dept. of Rev.*, 363 Or 441, 423 P3d 80 (2018). Even where the deficiency was originally assessed under the corporate excise tax, the department may rely upon the corporate income tax under the authority granted to this court under ORS 305.575. *See id.*

The requirement of "substantial nexus" is rooted in the Commerce Clause of the U.S. Constitution. *See also* OAR 150-317-0020(1), (2) (requiring "substantial nexus" for jurisdiction to tax and referencing the standard under the Commerce Clause). The U.S. Supreme Court has sustained taxes against Commerce Clause challenges where the tax is "applied to *an activity with a substantial nexus with the taxing State*, is fairly apportioned, does not discriminate against interstate commerce, and is fairly related to the services provided by the State." *Complete Auto Inc. v. Brady*, 430 US 274, 279, 97 S Ct 1076, 51 L Ed 2d 326 (1977) (emphasis added).

"'Substantial nexus' * * * does not require a taxpayer to have a physical presence in Oregon." OAR 150-317-0020(2). It "exists where a taxpayer regularly takes advantage of Oregon's economy to produce income for the taxpayer and may be established through the significant economic presence of a taxpayer in the state." *Id.* The following non-exhaustive factors are relevant to the substantial nexus determination: whether a taxpayer

> "(a) Maintains continuous and systematic contacts with Oregon's economy or market;
>
> "(b) Conducts deliberate marketing to or solicitation of Oregon customers;
>
> "(c) Files or is required to file reports or returns with Oregon regulatory bodies;
>
> "(d) Receives significant gross receipts attributable to customers in Oregon;
>
> "(e) Receives significant gross receipts attributable to the use of taxpayer's intangible property in Oregon; or
>
> "(f) Receives benefits provided by the state, such as:
>
>> "(A) Laws providing protection of business interests or regulating consumer credit;
>>
>> "(B) Access to courts and judicial process to enforce business rights, including debt collection and intellectual property rights;
>>
>> "(C) Highway or transportation system access for transport of taxpayer's goods or services;

"(D) Access to educated workforce in Oregon; or

"(E) Police and fire protection for property in Oregon that displays taxpayer's intellectual or intangible property."

OAR 150-317-0020(3), (4). The legislature maintained the same substantial nexus standards for interstate broadcasters as for other taxpayers. (*See* Def's Resp and MSJ, Ex A at 4, 7, 13 (legislative history so stating).)

3. *The parties' arguments*

Defendant argues that Plaintiff profited from audiences viewing its licensed programming in Oregon, as evidenced by its extensive reach: several of its cable networks, including ESPN, reached 97 to 98 million viewers nationwide and its ABC broadcast programming reached 99 percent of all U.S. television households. (Def's Resp and MSJ at 3-4.) Plaintiff received significant income from sales of advertising, which depends on the size and nature of the audience that it can deliver. (*Id.* at 4.) Plaintiff's intellectual property, including copyrighted material and trademarks such as logos, was used "prominently, continuously, and pervasively" in Oregon. (Def's Reply at 3.) For instance, the ESPN logo appeared in the program selection "navigator" or "electronic program guide system" as a requirement of its distribution agreements. (*Id.*, citing the ESPN and EchoStar Agreement).) ABC has registered with and submitted reports to the Oregon Secretary of State. (*Id.* at 4.) Several ESPN-affiliated entities have also registered with the Secretary of State, though evidently not ESPN, Inc.

Plaintiff maintains that ESPN "satisfied none" of the substantial nexus factors under OAR 150-317-0020(3). (Ptf's Reply at 11.) It emphasizes that it had no employees or physical property in Oregon; it had no privity of contract with Oregon subscribers; and its most significant licensing contracts were with cable and satellite distribution systems headquartered

outside of Oregon. (*Id.* at 11-12.) ESPN "had a few licensees who were based in Oregon" but the license fees received were "insignificant" compared to ESPN's total license fees. (*Id.* at 12, n26.) Because ESPN received most of its licensing fees from third parties based outside of Oregon, it did not receive "significant gross receipts attributable to customers in Oregon." (*See id.* at 12.) Plaintiff further maintains that ESPN was not "doing business" in Oregon, nor did it engage in any "income-producing activity" in Oregon under ORS 314.665(4) because its costs of performance were incurred in Connecticut. (*Id.* at 11, 14.)

Defendant responds that physical presence is not required under *South Dakota v. Wayfair, Inc. et al*, __ US __, 138 S Ct 2080, 2093 L Ed 3rd (2018) and it "has never been the law for corporation excise tax purposes because the constitutional standard is substantial nexus and economic presence and Oregon taxes to the full extent allowed by the constitution." (Def's Resp and MSJ at 2, citing *Capitol One Bank*, 22 OTR 326, *aff'd* 363 Or 441 (2018).) The substantial nexus standard refers to *contacts* with Oregon's economy or market, not *contracts*, noting that even Oregon-based broadcasters do not have contracts with their audiences. (Def's Reply at 1.) Through its contracts, ESPN retains control over its programming, including the specific events to be included and the precise date and time of delivery to viewers, including all commercial advertising. (*See id.* at 4 (citing ESPN and Comcast contract).)

4. *Analysis of substantial nexus*

Certain facts point to a finding that ESPN had substantial nexus with Oregon. Notably, ESPN derives significant gross receipts from its use of its intangible property in Oregon, particularly copyrighted programming broadcast to Oregon viewers and perhaps also use of its trademarks and logos. Numerous courts have held that the presence of intangible property within the state, including through licensing agreements, is sufficient for substantial nexus,

especially where the licensor receives royalties from sales or other income derived from the use of its intangible property.[24] The ESPN network reached 97 to 98 million subscribers nationwide, including an audience in Oregon. ESPN received significant advertising revenue based on the size and nature of its audience. Thus, it was necessary for ESPN's content – including advertisements – to reach a significant number of viewers nationwide and in Oregon. Although ESPN used licensing agreements to distribute its programming, it retained control over the precise content, time, and manner that its licensees could cablecast the ESPN network to subscribers. The licensees paid ESPN a monthly fee that varied based on the number of ESPN subscribers served. Those facts suggest that ESPN regularly took advantage of Oregon's market to provide viewers for its content, yielding licensing and advertising revenues for ESPN.

Plaintiff makes three main arguments in opposition to Defendant's contention that ESPN has substantial nexus with Oregon. First, ESPN lacked a physical presence in Oregon because it has no employees or physical property in Oregon. Second, ESPN did not derive gross receipts attributable to Oregon customers because it licensed its content to third party cable and satellite distributors, the majority of which were not headquartered in Oregon. Third, substantial nexus is a fact-based inquiry that is not ripe for summary judgment given materials facts in dispute.

/ / /

/ / /

---

[24] *See, e.g., Geoffrey, Inc. v. South Carolina Tax Comm'n*, 313 SC 15, 437 S E 2d 13 (1993) (substantial nexus existed where Geoffrey licensed the use of intangible property to Toys R Us for use it its retail stores in South Carolina and received a royalty of one percent of Toys R Us and its affiliates' net sales); *see also Lanco, Inc. v. Director, Div. of Tax.*, 379 NJ Super 562, 879 A 2d 1234 (App Div 2005) (out-of-state corporation had substantial nexus with New Jersey where it owned and licensed intangible personal property to Lane Bryant, Inc. for use in that company's retail operations in New Jersey and elsewhere); *see also In Matter of Heftel Broadcasting Honolulu, Inc.*, 57 Haw 175, 554 P2d 242 (1976) (out-of-state corporation had a substantial nexus with Hawaii where it received income from licensing to a Hawaiian station the right to telecast films; even though the licensing agreements were consummated on the mainland, the leased rights were exercisable only in Hawaii. The "telecast rights were wholly consumable and only consumable in Hawaii within specific time limits.").)

a. Physical presence

Plaintiff maintains that ESPN could not have substantial nexus with Oregon because it lacked a physical presence in the state. [25] The court agrees with Defendant that physical presence is not a prerequisite for nexus in the context of corporate excise or income tax. The issue was squarely before the court in *Capital One*: "whether the corporate excise tax or the corporate income tax may be imposed on purely economic activity in the state without any physical presence by Plaintiff (taxpayer)." 22 OTR at 327, *aff'd* 363 Or 441. The court first determined that neither Oregon law nor US Constitutional law required physical presence: "[N]exus [to tax] exists whenever the corporation takes advantage of the economic milieu within the state to realize a profit." *Id.* at 334 (quoting *American Refrigerator Transit v. Tax Comm'n*, 238 Or 340, 346, 395 P2d 127 (1964)). The court next considered whether *Quill's* reasoning under the Commerce Clause with respect to sales and use taxes applied equally in the context of corporate excise and income tax regimes. *Id.* at 338-342. The *Quill* Court's concerns of creating an undue burden on out-of-state taxpayers and disrupting settled expectations were not present in the context of corporate excise and income tax. *See id.* ESPN's lack of physical presence in Oregon is not a barrier to finding substantial nexus.

b. Privity of contract

Plaintiff argues that ESPN lacks substantial nexus with Oregon because it contracts with third parties headquartered in other states, *not* with Oregon customers, thus it does not derive income from customers in Oregon. For instance, ESPN licenses its programming to Comcast, which in turn bundles the ESPN network with other programming and sells subscriptions to

---

[25] In discussing broadcaster nexus with the Senate Committee on Finance and Revenue in 1989, Gardner referenced a "sales office" or a "crew presence" as creating nexus but recognized that the issue was "very much in flux and litigation right now." (Def's Resp and MSJ, Ex A at 44-45.)

customers located nationwide, including Oregon. Plaintiff alleges its licensing agreements were made in Connecticut. (Ptf's Reply at 14.) Plaintiff distinguishes ESPN's activities from the banks in *Capital One*, which "sent approximately 24,600,000 solicitations to Oregon customers"; had over 500,000 customers in Oregon; initiated thousands of lawsuits in Oregon to collect against delinquent accounts; and charged nearly $150,000,000 in bank fees each year. 22 OTR at 328-329. Plaintiff alleges that ESPN had no direct contact with Oregon customers, had no privity of contract with Oregon customers, and did not sue any Oregon citizens.

Defendant responds that ESPN's business, which is broadcasting, will look different than the banking business at issue in *Capital One*.[26] Even Oregon-based broadcasters, such as local TV stations, do not have privity of contract with their audiences. (Def's Reply at 1.) Defendant highlights the significant control ESPN retained over its programming through its licensing agreements, specifying the exact time, date, and content to be cablecast. (*See id.* at 4.)

It is well established that an out-of-state corporation's use of independent contractors to perform activities in the state is sufficient to establish substantial nexus under the Commerce Clause, assuming the activities "are significantly associated with the taxpayer's ability to establish and maintain a market in this state for the sales." *See Tyler Pipe Industries, Inc. v. Washington State Dept. of Rev.*, 483 US 232, 250, 107 S Ct 2810, 97 L Ed 2d 199 (1987); *see also Scripto, Inc. v. Carson*, 362 US 207, 211, 80 S Ct 619, 4 L Ed 2d 660 (1960) (holding that the distinction between employees and independent contractors was "without constitutional significance"). The question Plaintiff appears to raise is whether this reasoning applies where

---

[26] Indeed, the legislative history of the broadcaster statutes "recognizes that what you are selling, when you are selling advertising on television is basically an audience. You are selling access to more radio time. Access to a particular audience and apportion of sales on the basis of viewing of listening audience." (Def's Resp and MSJ, Ex A at 2-3 (statement of Gardner).)

ESPN is one further step removed from Oregon customers; that is, ESPN and Comcast have an agreement executed outside of Oregon and Comcast, in turn, contracts with Oregon customers.

The parties did not provide significant briefing on that question. The court's preliminary review yields limited case law touching on that precise question. In *Scioto Ins. Co. v. Oklahoma Tax Comm'n*, 2012 Ok 41, 279 P3d 782 (2012), the Oklahoma Supreme Court held that an out-of-state insurance company lacked substantial nexus under the Due Process Clause where it licensed intellectual property to Wendy's International, which in turn licensed the use of intellectual property to individual Wendy's restaurants within Oklahoma. Even though Scioto received royalties based on the gross sales of Wendy's restaurants, the court did not see a "clear * * * basis for Oklahoma to tax the value received by Scioto from Wendy's International under a licensing contract that was not made in the State of Oklahoma and no part of which was to be performed in Oklahoma."[27] *Id.* at 783. In *America Online, Inc. v. Johnson*, 2002 WL 1751434 (Ct App Tenn 2002), the court reversed a lower court's grant of summary judgment to AOL finding issues of material fact existed with respect to substantial nexus. AOL sent floppy disks to customers in Tennessee, who in turn accessed AOL's services by dialing a telephone number supplied by a third-party network service provider (NSP). *Id.* at *1.

/ / /

/ / /

/ / /

/ / /

/ / /

---

[27] The majority did not reach substantial nexus under the Commerce Clause, but the dissent opined that "the substantial nexus test was satisfied because Scioto's receipt of royalty income was directly connected to the use of its intellectual property in Oklahoma." *Id*. at 787.

"In this case there are a substantial number of businesses operating in this state helping make the AOL service available to Tennessee customers. The NSP provide services, some through their own equipment, and some by using equipment leased by AOL and located here. One of the NSPs is an AOL subsidiary. While the record is not developed to a point of clarity, we do not think the record shows that the activities conducted here on AOL's behalf could be termed inconsequential or of only slight significance. We think that AOL's connection with this state amounts to more than the Internet, mail and common carrier connection in *Quill* and *Bellas Hess*."

*Id.* at *3. Ultimately, more facts and briefing may help to resolve this question.

   c.   Genuine issues of material fact

Plaintiff maintains that genuine issues of material fact exist with respect to the question of substantial nexus and the matter is not yet ripe for the court's determination. It is not entirely clear which facts Plaintiff disputes – Plaintiff broadly asserted that ESPN met *none* of the substantial nexus factors under OAR 150-317-0020(3) without much further explanation. Nevertheless, the court recognizes that substantial nexus is a highly fact-dependent inquiry and declines to rule as a matter of law that ESPN had substantial nexus with Oregon.

## IV.  CONCLUSION

Upon careful consideration, the court concludes that the broadcaster statutes may be applied to the receipts of a unitary group filing a consolidated return. They are not limited in application to a single corporation. The court further concludes that Plaintiff was an "interstate broadcaster" for the tax years at issue. Although ESPN derives gross receipts from its use of its intangible property in Oregon, that is only one of many factors relevant to substantial nexus. The court declines to rule as a matter of law that ESPN had substantial nexus with Oregon during the tax years at issue and will allow the parties more time to develop those facts. Now, therefore,

/ / /

/ / /

IT IS ORDERED that Plaintiff's Motion for Partial Summary Judgment is denied.

IT IS FURTHER ORDERED that Defendant's Motion for Summary Judgment is granted in part and denied in part.

IS IT FURTHER ORDERED that, within 30 days the parties will file a joint written status report notifying the court of next steps.

Dated this ___ day of April 2020.


_____
ALLISON R. BOOMER
PRESIDING MAGISTRATE

*This interim order may not be appealed. Any claim of error in regard to this order should be raised in an appeal of the Magistrate's final written decision when all issues have been resolved. ORS 305.501.*

*This document was signed by Presiding Magistrate Allison R. Boomer and entered on April 22, 2020.*