IN THE OREGON TAX COURT
MAGISTRATE DIVISION
Corporation Excise Tax

| | | |
|---|---|---|
| CHEVRON U.S.A. INC. a Pennsylvania Corporation, | ) | |
| | ) | |
| Plaintiff, | ) | TC-MD 190031N |
| | ) | |
| v. | ) | |
| | ) | |
| DEPARTMENT OF REVENUE, State of Oregon, | ) | |
| | ) | **ORDER ON CROSS MOTIONS FOR** |
| Defendant. | ) | **SUMMARY JUDGMENT** |

This matter came before the court on the parties' cross motions for summary judgment concerning the inclusion of Plaintiff's commodities hedging receipts in the sales factor under ORS 314.665(6).  Oral argument was held by telephone on July 15, 2020.  Kristin L. Goodin, attorney, appeared on behalf of Plaintiff.  Marilyn J. Harbur and Daniel Paul, Senior Assistant Attorneys General, appeared on behalf of Defendant.

## I.  STATEMENT OF FACTS

A.    *Overview of Plaintiff's Business*

Plaintiff and its subsidiaries "engage in fully integrated petroleum operations, chemicals operations, mining operations, power generation and energy services." (Stip Ex 1 at 5.)  It describes its business in terms of "upstream" and "downstream" operations:

> "Upstream operations consist primarily of exploring for, developing and producing crude oil and natural gas; processing, liquefaction, transportation and regasification associated with liquefied natural gas; transporting crude oil by major international oil export pipelines; transporting, storage and marketing of natural gas; and a gas-to-liquids project.  Downstream operations consist primarily of refining crude oil into petroleum products; marketing of crude oil and refined products; transporting crude oil and refined products by pipeline, marine vessel, motor equipment and rail car; and manufacturing and marketing of commodity petrochemicals, plastics for industrial uses and fuel and lubricant additives."

(*Id.*; *see also* Stip Exs 2 at 4, 3 at 6.) Of Plaintiff's total expenditures, upstream activities accounted to 89 percent in 2011 and 2012, and 90 percent in 2013. (Stip Ex 3 at 8.)

Plaintiff "is primarily in a commodities business with a history of price volatility. The single largest variable that affects the company's results of operations is the price of crude oil, which can be influenced by general economic conditions, industry inventory levels, production quotas imposed by the Organization of Petroleum Exporting Countries (OPEC), weather-related damage and disruptions, competing fuel prices and geopolitical risk." (Stip Ex 1 at 31.) It is also "exposed to market risks related to the price volatility of * * * refined products, natural gas, natural gas liquids, liquefied natural gas and refinery feedstocks." (*Id.* at 54.)

B.     *Plaintiff's Hedging Program*

Plaintiff uses derivative commodity instruments to manage risks relating to "the purchase, sale and storage of crude oil, refined products, natural gas, natural gas liquids and feedstock for company refineries." (Stip Ex 1 at 77.) It "also uses derivative commodity instruments for limited trading purposes." (*Id.* at 54.) Plaintiff's derivative commodity instruments "consist mainly of futures, options and swap contracts traded on" stock exchanges and electronic platforms. (*Id.*) It also enters swap contracts and option contracts "with major financial institutions and other oil and gas companies in the 'over-the-counter' markets." (*Id.*) Most of Plaintiff's derivative commodity instruments "can be liquidated or hedged effectively within one day" and Plaintiff manages its market positions daily. (*Id.*)

The "majority" of Plaintiff's "activity in derivative commodity instruments is intended to manage the financial risk posed by physical transactions." (Stip Ex 1 at 69.) However, Plaintiff's "derivatives are not material to [its] financial position, results of operations or liquidity. [It] believes it has no material market or credit risks to its operations, financial position

or liquidity as a result of its commodity derivative activities." (*Id.* at 77.)

As required by Treasury Regulation section 1.1221-2(f)(3)(iv), Plaintiff maintains "Aggregate Hedging Program Descriptions" for its crude oil and natural gas business lines. (Ptf's Exs 4, 5.) It describes Plaintiff's hedging program and provides specific guidance to its staff regarding whether financial contracts should be identified as "either hedge or speculative trades" before any gains or losses are realized. (Ptf's Ex 4 at 2.) Plaintiff's physical traders trade in oil and oil products, as well as natural gas and related products. (*Id.*; Ptf's Ex 5 at 2) Plaintiff's "structural financial traders" "trade around the resulting net exposure from the physical traders' activities * * *." (Ptf's Ex 4 at 1.) "This structure activity is focused on pricing, exposure, financial trading, and balancing financial and physical exposures[.]" (*Id.*) Examples of "physical" contracts that create risk are those "for purchase or sale of physical volumes of crude LPG or refined products," transport of those products, and storage of those products. (*Id.* at 3.) "A critical strategy" is to manage the "risks inherent in the crude, LPG and product trading markets[,]" one of which is price risk. (*Id.* at 2.) "The primary purpose" of Plaintiff's financial trading "is to mitigate the price risks associated with its physical transactions[.]" (*Id.* at 3.) Plaintiff uses financial contracts to "eliminate the risk that market prices will change as margins earned on physical deals will be reduced or lost." (*Id.* at 3.) The financial contracts " 'lock in' margins on physical deals[.]" (*Id.*)

C.      *Plaintiff's Accounting for Hedging Transactions*

"Derivatives beyond those designated as normal purchase and normal sale contracts are recorded at fair value" on Plaintiff's balance sheet, in accordance with relevant accounting standards, "with resulting gains and losses reflected in income." (Stip Ex 1 at 54.) The tax treatment of hedging requires reporting on a realization basis. (Ptf's Ex 4 at 5.) Hedges are

"matched to the underlying physical business, and upon settlement the gain or loss is recognized as ordinary income." (Ptf's Ex 4 at 5.) By contrast, "trades classified as speculative recognize the full mark to market earnings impact as capital gains and losses in the current reporting period." (*Id.*) Ordinary tax treatment of a hedge "allow[s] net annual losses to be offset by [Plaintiff's] ordinary profits." (*Id.* at 7.)

D.      *Plaintiff's Tax Returns and Defendant's Adjustments*

Plaintiff "filed amended Oregon Corporation Excise Tax Returns for the tax years 2011, 2012, and 2013 to reflect the inclusion of gross hedging receipts in the Oregon sales factor." (Ptf's Mot for Summ J at 2, citing Compl.) Defendant issued notices of deficiency for each of those years. (Compl at 3.) At Plaintiff's request, Defendant held a conference and the sole issue was whether Plaintiff's gross hedging receipts were includable in the Oregon apportionment sales factor. (Compl, Ex A at 2.) Defendant concluded that the gross hedging receipts were not includable in Plaintiff's sales factor under ORS 314.665(6)(a) because they arose from the sale of intangible assets and were not derived from Plaintiff's primary business activity. (*Id.* at 4-5.) Defendant included the net gain from Plaintiff's hedging activities under ORS 314.665(6)(b) because hedging activity was an integral part of Plaintiff's business and, therefore, generated business income under ORS 314.610(1).[1] (*Id.* at 6.) Finally, Defendant reached an alternative conclusion that including gross hedging receipts in Plaintiff's sales factor would not fairly represent Plaintiff's business activity in Oregon under ORS 314.667. (*Id.* at 6-7.) Defendant issued notices of assessment following its conference decision. (*Id.* at 3.) This appeal ensued.

///

///

---

[1] Defendant wrote that "this adjustment will not change the result of [Plaintiff's] tax." (Compl, Ex A at 7.)

## II. ISSUES, PARTIES' POSITIONS, STANDARD OF REVIEW

The issues presented for the 2011, 2012, and 2013 tax years are: 1) whether Plaintiff's hedging receipts arise from the "sale, exchange, redemption or holding of intangible assets" under ORS 314.665(6)(a); and, if so, 2) whether those receipts derive from Plaintiff's "primary business activity" under ORS 314.665(6)(a). If the answer to the first question is yes and the answer to the second question is no, then the gross receipts are excluded from the sales factor under ORS 314.665(6)(a).[2]

Plaintiff moves for summary judgment on the first issue, arguing that commodity hedging transactions are inextricably linked to the underlying commodity and therefore are different in kind from other forms of financial and speculative hedging for investment or cash management purposes. (Ptf's Mot for Summ J at 8.) Plaintiff argues that gross hedging receipts should be apportioned to Oregon under ORS 314.665(2) in the same manner as the underlying commodity. (Ptf's Reply at 2.) Such treatment is consistent with federal income tax law. (Ptf's Mot for Summ J at 8-15.) Plaintiff asks the court to deny summary judgment on the second issue, asserting that issues of material fact exist. (Ptf's Reply at 4.)

Defendant also moves for summary judgment on the first issue, arguing that Plaintiff's commodity hedging receipts arise from the transfer of intangible assets, a term which is defined broadly under *Tektronix, Inc. v. Dept. of Rev.*, 354 Or 531, 316 P3d 276 (2013). (Def's Mot for Summ J at 3-5.) As with "cash management" or investment receipts, including gross hedging receipts would distort the sales factor due to the significant number of financial transactions. (*Id.* at 3-4.) Defendant moves for summary judgment on the second issue, arguing that the hedging

---

[2] However, Defendant included the net gain from Plaintiff's hedging activities under ORS 314.665(6)(b) because hedging activity was an integral part of Plaintiff's business.

receipts to not derive from Plaintiff's primary business activity based on the factors set forth in OAR 150-314.665(6)(3). (*Id.* at 5-7.)

The court grants a motion for summary judgment if all the documents on file "show that there is no genuine issue as to any material fact and that the moving party is entitled to prevail as a matter of law." Tax Court Rule (TCR) 47.[3] "No genuine issue as to a material fact exists if, based upon the record before the court viewed in a manner most favorable to the adverse party, no objectively reasonable juror could return a verdict for the adverse party * * *." *Id.*

## III. ANALYSIS

This court recently described the six-step process for determining the Oregon taxable income of a multinational group of corporations. *Oracle Corp. v. Dept. of Rev.*, TC 5340, 2020 WL 7765776 at *2 (Or Tax, Dec 16, 2020). The issues here pertain to step five: determining the correct Oregon apportionment formula by which apportionable business income is multiplied. *See id.* at *3. For the tax years at issue, "Oregon's UDITPA prescribed a standard single-factor formula based solely on the taxpayer's 'sales' in Oregon compared to sales everywhere." *Id.*; ORS 314.650.[4] Sales are defined as "all gross receipts of the taxpayer not allocated" as nonbusiness income. ORS 314.610(7). Notwithstanding that definition, ORS 314.665(6)(a) excludes "gross receipts arising from the sale, exchange, redemption or holding of intangible assets, including but not limited to securities, unless those receipts are derived from the

///

---

[3] TCR 47 is made applicable by Tax Court Rule – Magistrate Division (TCR-MD) 13 B which provides that "[t]he court may apply TCR 47 to motions for summary judgment, to the extent relevant."

[4] The court's references to the Oregon Revised Statutes (ORS) are to 2009. Although the 2011 edition of the ORS is applicable to the 2012 and 2013 tax years, the relevant statutes are the same as in 2009. Oregon applies special apportionment formulas for certain industries such as public utilities, financial organizations, insurers, and interstate broadcasters. *See* ORS 314.615, 314.280, 317.660, and 314.682. There is not contention that any of those special formulas apply here.

taxpayer's primary business activity."  ORS 314.665(6)(b) allows the inclusion of net gain from those sales if they are "included in the taxpayer's business income."

A preliminary question is whether Plaintiff's hedging activity yielded "gross receipts" and therefore sales within the meaning of UDITPA.  *See Oracle,* 2020 WL 7765776 at *6-11 (analyzing the text, context, and legislative history of "gross receipts" to determine if certain income met the definition).  On this point, the parties agree that Plaintiff's hedging receipts are "gross receipts" under UDITPA and the court sees no basis for a contrary conclusion.  (*See* Ptf's Mot for Summ J at 6, Def's Mot for Summ J at 3.)  The next question is whether the receipts arose from the transfer or holding of intangible assets.

A.      *Were Plaintiff's Derivative Commodity Instruments Intangible Assets?*

The Oregon Supreme Court considered the meaning of "intangible assets" in *Tektronix*, 354 Or 531, holding that the taxpayer's sale of goodwill associated with its printer division was properly excluded from the sales factor under ORS 314.665(6)(a) as an intangible asset.  The court reviewed the text, context, and legislative history, finding that the term "intangible assets" had a "well-defined and therefore applicable legal meaning."  *Id.* at 543-545.  It means "any nonphysical asset or resource that can be amortized or converted to cash" and "property representative of a right rather than a physical object."  *Id.* at 543-44 (citing *Black's Law Dictionary* 134 (9th ed 2009) and *West's Tax Law Dictionary* 570 (2013)).  Examples include copyrights, patents, trademarks, stocks, bonds, goodwill, franchises, and computer programs.  *Id.*

Intangible property may be contrasted with "tangible personal property."[5]  The Oregon Supreme Court considered the meaning of that term under ORS 314.665(2)(a) in *Powerex v.*

---

[5] The definition of "tangible personal property" is also relevant because Plaintiff argues that its hedging receipts should be sourced using the rules applicable to such property.

*Dept. of Rev.*, 357 Or 40, 346 P3d 476 (2015), holding that electricity was tangible personal property. This court had determined that electricity was not tangible property based on expert testimony from physics professors, so it allocated taxpayer's sales of electricity to the state where the greater part of its income-producing activity occurred. *Id.* at 57-58. The Oregon Supreme Court disagreed that principles of physics controlled the outcome, looking instead to the context in which the term was used – UDITPA – including the text, context, and legislative history. *Id.* at 60. The court concluded that the relevant qualities

> "were whether the property sold was perceptible to the senses, could be located physically within a state, and could be delivered or shipped to a place. A related quality was that the physical properties of tangible personal property were what made it useful while the physical properties of intangible property had little or no relation to that property's value or usefulness. Rather, the value of intangible property derives from the rights and obligations it represents."

*Id.* at 65. Although electricity does not fall neatly into either category, the court held it was tangible, noting it was "perceptible to the senses," valuable based on its physical properties, and could "be physically located within a state and shipped from one state to another." *Id.* at 66.

Turning to the derivative commodity instruments at issue (futures, options, and swap contracts), the court begins with an overview of these types of contracts.

> "A commodity futures contract consists of a firm, legal agreement between a buyer (or seller) and an established commodity exchange or its clearinghouse whereby the trader agrees to accept (or deliver) between designated dates, a carefully specified 'lot' of a commodity meeting the quality and delivery conditions prescribed by the commodity exchange, with cash settlement on delivery date at a settlement price to be prescribed. The trader agrees to an arrangement with a qualified broker (or the clearinghouse) to provide him with a margin deposit as required, and also agrees to reimburse him or accept credit for all interim gains or losses in value of that futures contract resulting from day-to-day changes in its price on the floor of the established commodity exchange. The trader has an option which permits him to close out his contract at any time (at the market) simply by notifying his broker of his desire; and, on the other side, it permits the broker to close out the commitment if the margin is impaired by disposing of the contract at the market."

*Vickers v. Comm'r*, 80 TC 394, 396-97 (1983). Like stocks – which are specifically identified as intangible assets – derivative commodity instruments are traded on exchanges. Although the value of the contract relates to the price of the underlying commodity, the contracts are nonphysical assets that can be quickly converted to cash.[6] They represent a right rather than a physical object; namely, the right to buy or sell a commodity at an established price on a given date. *See Modesto Dry Yard, Inc. v. Comm'r*, 14 TC 374, 385 ("Transactions in commodity futures are commonly spoken of as purchases and sales of a specific commodity such as corn, wheat, or cotton, but the traders really acquire rights to the specific commodity rather than the commodity itself. These rights are intangible property which may appreciate or depreciate in value."); *see also Comcast*, 2020 WL 6948453 at *21 (referring to futures contracts as "intangibles"). The court preliminarily concludes that derivative commodity instruments are intangible assets within the meaning of ORS 314.665(6)(a).

1.      *Treatment of commodity hedging transactions under federal tax law*

Notwithstanding their character as intangible assets, Plaintiff argues that its hedging receipts should be sourced in the same manner as the underlying physical commodity being hedged because that is how federal tax law treats such transactions and Oregon corporate excise tax adopts by reference those portions of the IRC and other federal law pertaining to the determination of taxable income. (Ptf's Mot for Summ J at 8 (citing ORS 317.013).) It maintains that *Tektronix* does not control the outcome here because it did not consider "the unique nature of commodity hedging transactions." (Ptf's Reply at 4.) Defendant agrees that Oregon looks to federal law to compute taxable income and also agrees with Plaintiff's

---

[6] According to Plaintiff, most of its derivative commodity instruments "can be liquidated or hedged effectively within one day." (Stip Ex 1 at 54.)

description of the federal income tax treatment of commodity hedging, but disagrees that that federal law is relevant here because "[t]he apportionment of taxable income between the many states is an issue unique to state taxation." (Def's Mot for Summ J at 8; Reply at 1-2.) The federal law cited by Plaintiff concerns whether hedging transactions yield ordinary or capital gains and losses, an issue which "has no bearing on the definition of sales for apportionment under ORS 314.665." (Def's Mot for Summ J at 8.)

Hedging transactions, clearly identified as such on the day of acquisition, origination, or entry, are excluded from the definition of "capital asset" under IRC section 1221(a)(7).[7] A "'hedging transaction' means any transaction entered into by the taxpayer in the normal course of the taxpayer's trade or business primarily [] to manage risk of price changes or currency fluctuations with respect to ordinary property which is held or to be held by the taxpayer[.]" IRC § 1221(b)(2)(A)(i). "[G]ain or loss on a short sale or option that is part of a hedging transaction * * * is ordinary income or loss." Treas Reg § 1.1221-2(a)(2). "The fact that a taxpayer frequently enters into and terminates positions (even if done on a daily or more frequent basis) is not relevant to whether these transactions are hedging transactions." Treas Reg § 1.1221-2(d)(7).

The treatment of commodity hedging transactions as generating ordinary, rather than capital, income and loss dates back to the "Corn Products doctrine." In *Corn Products Refining Co v. Comm'r*, 350 US 46, 76 S Ct 20, 100 L Ed 29 (1955), the Court held that taxpayer's purchases and sales of corn futures generated ordinary rather than capital income. It explained that "Congress intended that profits and losses arising from the everyday operation of a business be considered as ordinary income or loss rather than capital gain or loss." *Id.* at 52.[8] Taxpayer –

---

[7] By contrast, *speculative* trading of futures contracts yields capital gains or losses. *See Vickers*, 80 TC at 405-410 (summarizing cases so holding).

[8] Notwithstanding that reasoning, the Court declined to extend the *Corn Products* doctrine to capital stock

a manufacturer that used raw corn in its operations – purchased and sold corn futures "as a form of insurance against increases in the price of raw corn," not to speculate. *Id.* at 50-51. Thus, the futures were not "separate and apart from [taxpayer's] manufacturing operation." *Id.* at 50. The Court subsequently explained that "*Corn Products* is properly interpreted as standing for the narrow proposition that hedging transactions that are an integral part of a business' inventory-purchase system fall within the inventory exclusion of § 1221." *Arkansas Best Corp. v. Comm'r*, 485 US 212, 108 S Ct 971, 99 L Ed 2d 183 (1988).

Even though most commodity derivatives are settled through offset[9] rather than through physical delivery of the commodity, courts have treated the offsets as constructive delivery and therefore sales. *See Board of Trade of the City of Chicago v. Christie Grain and Stock Co.*, 198 US 236, 246-50, 25 S Ct 637, 49 L Ed 1031 (1905) ("in not less than three quarters of the transactions in the grain pit there is no physical handing over of any grain"; rather, contracts to buy are set off against contracts to sell, with the difference of price paid in cash);[10] *Lyons Milling Co. v. Goffe & Carkener, Inc.*, 46 F2d 241, 247 (10th Cir 1931) ("A set-off is a method by which a contract to purchase is set off against a contract to sell without the formality of an exchange of warehouse receipts or other actual delivery and, in legal effect, is a delivery."); *The Hoover Company v. Comm'r*, 72 TC 206, 248-50 (1979) (rejecting taxpayer's argument that currency

---

in a bank that taxpayer held for business rather than investment purposes. *Arkansas Best Corp. v. Comm'r*, 485 US 212, 108 S Ct 971, 99 L Ed 2d 183 (1988).

[9] Older cases use the term "set-off" whereas newer cases, IRC section 1221, and Treasury Regulation 1.1221-2 use the term "offset." The terms appear to be interchangeable.

[10] The case concerned whether such derivative transactions were illegal gambling. The court concluded that they were not; the contracts were made in "good faith" and "for serious business purposes." 198 US at 248-49. Commodity derivative transactions must involve the transfer of property, otherwise such transactions could not "be distinguished from mere wagering * * * betting or gambling." *Covington v. Comm'r*, 120 F2d 768, 769-70 (1941) (rejecting taxpayer's argument that his commodity futures losses were ordinary rather than capital because he did not own or acquire property; rather, he entered into and closed out executory contracts at a profit or loss without any sale or exchange of property).

forward sale contract offsets were "mere releases" that did not meet the "sale or exchange" requirement for treatment as capital losses; offsetting is "the most common method of settling a forward sale contract" and "has been held to be delivery under the sale contract * * * satisfying the sale or exchange requirement on the date the contract is settled"); *Vickers*, 80 TC at 398-99 ("Most commodity futures contracts are terminated without actual delivery of the commodity." A "sale or exchange" occurred when taxpayer closed out his contracts through offsetting.).

In sum, federal tax law treats commodity derivative instruments as capital assets unless they are "hedging transactions" *i.e.,* designated as such, and used by a taxpayer to manage price risk with respect to property held in its trade or business. Commodity derivative instruments used for hedging are treated like inventory or other raw materials used in the taxpayer's business. This is so even if the taxpayer settles its derivative contracts through offset rather than physical delivery or receipt of the commodity. The question becomes whether that treatment of commodity hedging under federal tax law changes the court's preliminary conclusion that derivative commodity instruments are intangible assets under ORS 314.665(6)(a).

2.      *Context of UDITPA and state apportionment*

Plaintiff relies on ORS 317.013(1), which adopts by reference those portions of the IRC and federal law "pertaining to the determination of taxable income of corporate taxpayers." That statute further directs the Department of Revenue to "apply and follow the administrative and judicial interpretations of the federal income tax law." ORS 317.013(2). The Oregon legislature has declared its intent "[t]o make the Oregon corporate excise tax law, insofar as it relates to the measurement of taxable income, identical to the provisions of the federal [IRC] * * * to the end that taxable income for Oregon purposes is the same as it is for federal income tax purposes[.]" ORS 317.018(1). To achieve that purpose, Oregon applies IRC provisions "relating to the

definitions for corporations, of income, deductions, accounting methods, accounting periods, taxation of corporations, basis and other pertinent provisions relating to gross income." ORS 317.018(2). It does not look to the IRC for computation of tax or tax credits. *Id.*

Although the court is bound to apply the IRC and federal law in its determination of Plaintiff's taxable income, the composition of the sales factor used to apportion Plaintiff's income to Oregon is a matter of state, not federal, law. *See Dept. of Rev. v. Washington Federal*, 20 OTR 507, 2012 WL 3024189 at *5 (2012) ("as to allocation and apportionment of income of corporations operating in two or more states, the governing provisions are derived solely from Oregon law"). To be sure, definitions and concepts from federal tax law may be relevant to understand terms used in Oregon law. *See, e.g., Comcast Corp. v. Dept. of Rev.*, TC 5265, 2020 WL 6948453 at *35-37 (Or Tax, Nov 25, 2020) (in determining the meaning of "net income or profits" as used in Oregon statute, the court considered the context of the term when it entered Oregon law, including the IRC). Moreover, courts – including this one – have cited the *Corn Products* doctrine when analyzing whether an asset satisfies the operational function test of *Allied-Signal, Inc. v. Director*, 504 US 768, 112 S Ct 2251, 119 L Ed 2d 533 (1992) to determine whether income is apportionable under the U.S. Constitution. *See id.* at *20-21.

Here, the question is whether the *Corn Products* doctrine and related federal law is relevant to the treatment of derivative commodity instruments in Oregon's UDITPA sales factor. The court bears in mind the context and purpose of UDITPA: to create "a uniform method of attributing an appropriate portion of a multistate taxpayer's overall net income to each state;" not "a uniform definition of 'income[.]' " *Oracle*, 2020 WL 7765776 at *8. UDITPA's sales factor refers to "gross receipts" rather than "income," terms which were not viewed synonymously by UDITPA's drafters, suggesting income is "something different from the factors used to *attribute*

income to a particular state." *Id.* (emphasis in original). Historically, UDITPA applied three equally weighted factors to apportion income to Oregon: property, payroll and sales. *Id.* at *9. The property factor included only real and tangible personal property. *Id.* "For apportionment purposes, identifying a physical location for the property was key." *Id.* The payroll factor also "focused on the physical location of the individual worker or of the persons controlling the worker's actions, again reflecting physical business activity in the state." *Id.*

Applying the foregoing, the court finds that the character of hedging receipts under federal tax law (ordinary rather than capital) is not relevant to determining how such receipts should be reflected in the sales factor used to apportion income to Oregon. Notwithstanding the "constructive delivery" doctrine applied to offsets, Plaintiff's hedging transactions do not result in physical delivery of the underlying commodity. In that respect, they are not tangible personal property under ORS 314.665(2)(a) and should not be treated as such for apportionment purposes.

3.  *History of ORS 314.665(6)(a): the "treasury function" receipts problem*

The court briefly considers the legislative history of ORS 314.665(6). Although not limited to such assets, ORS 314.665(6) was enacted to address the problem of "treasury function" gross receipts. *See Tektronix*, 354 Or at 545. This court described the problem more fully in its *Tektronix* opinion: Prior to the enactment of ORS 314.665(6),

> "a company buying and selling large quantities of financial instruments in connection with the cash management functions of the company would have extremely large gross receipts from the sales of intangibles. In some cases companies would buy and sell, on a daily basis, hundreds of millions of dollars of short term instruments, producing hundreds of millions of dollars of gross receipts—even though the net gain on such transactions could be very small. As the income producing activity associated with the treasury function activity occurred, typically, at the headquarters of the company, the numerator of the sales factor for the headquarters state would have, some felt, an improperly large number in the numerator of sales factor. That would, in the minds of some, skew the apportionment of income of the company to the headquarters state."

*Tektronix, Inc. v. Dept. of Rev.*, 20 OTR 468, 493-94 (2012), *aff'd but criticized*. Plaintiff's hedging transactions serve a purpose beyond cash management and so do not fall within the precise definition of the "treasury receipts" as described in *Tektronix*. However, Plaintiff's hedging receipts may create the same distortion problem described by the court given the number of such transactions and the resulting quantity of gross receipts. Excluding Plaintiff's gross hedging receipts under ORS 314.665(6)(a) is consistent with the legislative intent of that statute.

4.      *Treatment of hedging receipts by other states*

Finally, Plaintiff argues that other states that have adopted UDITPA have included gross hedging receipts in the state apportionment factor. (Ptf's Mot for Summ J at 16-17 (citing *General Mills v. Franchise Tax Board*, 172 Cal App 4th 1535, 92 Cal Rptr 3d 208 (2009), and *In Re: Archer Daniels Midland Company*, Pennsylvania Board of Finance and Revenue, Docket No. 1523133 (2018)).) The court has reviewed the cases cited by Plaintiff and concludes that they do not change the outcome of this analysis because neither involved a statute like ORS 314.665(6), that excludes from the sales factor gross receipts from the sale of intangible assets. Each case concerned whether hedging transactions were "sales" for purposes of the sales factor – a point not in dispute here – and, in *General Mills*, the amount of gross receipts to be included. *See* 172 Cal App 4th at 1548(concluding " 'gross receipts' from a futures sales contract are equivalent to the full sales price of the contract").

5.      *Conclusion: Plaintiff's derivative commodity instruments are intangible assets*

Plaintiff's derivative commodity instruments are intangible assets within the meaning of ORS 314.665(6)(a). They do not share important characteristics of tangible personal property and should not be sourced as such. The fact that such assets are used in Plaintiff's commodity hedging program and treated as ordinary rather than capital assets under federal tax law does not

alter that conclusion because the rules for apportioning income to Oregon serve a different purpose than the rules for determining federal taxable income. Including gross hedging receipts in Plaintiff's sales factor may result in the type of distortion that ORS 314.665(6) was enacted to prevent.

B.      *Whether Plaintiff's Hedging Receipts Derive from its Primary Business Activity*

Having concluded that Plaintiff's hedging receipts arose from sales of intangible assets, the next question is whether they may nevertheless be included in Plaintiff's sales factor because they derive from Plaintiff's "primary business activity." Defendant moves for summary judgment on this question, arguing that Plaintiff's business included two segments – upstream and downstream – neither of which included its hedging activities. (Def's Mot for Summ J at 5-6.) Plaintiff asks the court to deny summary judgment, alleging that issues of material fact exist.

In *Tektronix*, the Oregon Supreme Court concluded that taxpayer's sale of goodwill did not derive from its primary business activity, reasoning that "taxpayer's 'primary business' was 'manufacturing and distributing electronics products'" and not "engaging in the sale of its divisions[.]" *Id.* at 547-48. More recently, this court observed that – although the legislative history of ORS 314.665(6)(a) indicates that the primary business exception applies to taxpayers "in the primary business of selling short-term securities or passively holding intangibles that produce interest or dividends" – it is not limited by its terms to that circumstance. *Oracle*, 2020 WL 7765776 at *16.[11] Indeed, Defendant's administrative rule identifies seven non-exhaustive

---

[11] Previously, in recounting the history of ORS 314.665(6), this court described it as dividing "the world into two hemispheres[:] * * * companies whose primary business involved the sale of intangible assets assets—for example, firms trading securities for their own account" and all others. *Tektronix*, 20 OTR at 495. However, the court in that opinion limited the scope of ORS 314.665(6)(a) to the "treasury function" problem described in the legislative history. The Oregon Supreme Court rejected that conclusion, observing that the legislature used the broader language of "intangible assets" – indicating its intention for a broader application of ORS 314.665(6)(a). *Tektronix,* 354 Or at 543, 546. Similarly, the term "primary business activity" is broader than the examples given in legislative history indicating it is not narrowly limited by those examples.

factors to consider when identifying a taxpayer's primary business activity:

    (a) The stated business in the articles of incorporation.

    (b) The business category entered on the Securities and Exchange Commission Form 10-K of a publicly held corporation.

    (c) The business designation in a "mission statement."

    (d) The business activity with the greatest average investment in tangible and intangible assets from the balance sheet for the tax return.

    (e) The business designation in advertising.

    (f) The business with the greatest amount of net sales of product and services as reported under Generally Accepted Accounting Principles.

    (g) The business activity from which working capital is transferred to investments in intangible assets and to which the working capital and income is returned.

OAR 150-346.665(6)(3) (2011). Plaintiff has presented evidence of the integral role that hedging plays in its business and requested the opportunity to present additional evidence on the question of its primary business activity. Given the fact-dependent nature of the inquiry, the court concludes that summary judgment is not appropriate at this time.

## IV. CONCLUSION

Upon careful consideration, the court concludes that Plaintiff's commodity hedging receipts arose from sales of intangible assets within the meaning of ORS 314.665(6)(a). Accordingly, the gross receipts are excluded from Plaintiff's sales factor unless they derive from Plaintiff's primary business activity, a question of fact. Now, therefore,

IT IS ORDERED that Plaintiff's Motion for Summary Judgment is denied.

IT IS FURTHER ORDERED that Defendant's Motion for Summary Judgment is granted in part and denied in part.

/ / /

IT IS FURTHER ORDERED that, within 30 days from the date of this Order, the parties shall file a joint written status report proposing next steps.

Dated this _____ day of April 2021.

_____
ALLISON R. BOOMER
PRESIDING MAGISTRATE

***This interim order may not be appealed. Any claim of error in regard to this order should be raised in an appeal of the Magistrate's final written decision when all issues have been resolved. ORS 305.501.***

***This document was signed by Presiding Magistrate Allison R. Boomer and entered on April 14, 2021.***